2023 IL App (2d) 220280-U
No. 2-22-0280
Order filed February 21, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF BILLIE JO HINNEN, | ) ) ) | Appeal from the Circuit Court of McHenry County. |
| Petitioner-Appellee, | ) ) | |
| and | ) ) | No. 17-DV-343 |
| BRYAN DEAN HINNEN, | ) ) ) | Honorable Justin M. Hansen, |
| Respondent-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Hutchinson and Hudson concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The trial court did not err in (1) granting petitioner's request to relocate with the parties' minor child; (2) denying respondent's petitions for orders of protection; (3) excluding from evidence several video and audio recordings of the parties' minor child, which were made by respondent and his sister; and (4) denying respondent's motion to reconsider based on newly-discovered evidence. Affirmed.

¶ 2   In August 2017, the trial court entered a judgment dissolving the marriage of petitioner, Billie Jo Hinnen, and respondent, Bryan Dean Hinnen. The judgment incorporated the parties' agreed allocation of parental responsibilities and parenting plan, under which the parties' minor child, C.H., resided primarily with Billie.

¶ 3    In August 2021, Billie petitioned, under section 609.2 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/609.2 (West 2020)), to relocate with C.H. to the Washington, D.C., area. Highly contentious litigation followed, in which both parties filed several other pleadings and motions. Relevant to this appeal, Bryan moved to modify the judgment, asking the court to place C.H. with him. He later filed an amended petition for an order holding Billie in direct and indirect criminal contempt and two petitions for emergency orders of protection.

¶ 4    The trial court consolidated for hearing the pending pleadings and, after a hearing, granted Billie's petition to relocate and denied Bryan's motion and petitions. It later denied Bryan's amended motion to reconsider that was based in part on purportedly newly-discovered evidence.

¶ 5    Bryan, who has at all times in this case acted *pro se*, appeals, contending the trial court erred by (1) granting Billie's request to relocate, (2) denying his petitions for orders of protection, (3) denying his motion to reconsider, and (4) excluding from evidence several video and audio recordings of C.H. that were created by Bryan and/or his sister, Ann Sparks. We affirm.

¶ 6                          I. BACKGROUND

¶ 7                    A. The Parties' Marriage and Divorce

¶ 8    Billie and Bryan married in January 2001. They had two children: C.H., who was born on June 27, 2012, and another who passed away in June 2011, shortly after his birth. C.H. is on the autism spectrum, which manifests with pervasive developmental delay and apraxia of speech, and has attention-deficit/hyperactivity disorder (ADHD) and generalized anxiety disorder.

¶ 9    The parties divorced in August 2017. They came to an agreement on the allocation of parental responsibilities and a parenting plan and went to trial on other issues. The judgment dissolving the parties' marriage incorporated their agreed allocation of parental responsibilities and parenting plan. The judgment assigned to Billie a majority of the parenting time but granted

liberal visitation to Bryan. Specifically, Bryan was permitted three hours of visitation every Monday through Thursday, as well as overnight visitation from 2:30 p.m. on Friday to 6 p.m. on Saturday.[1] Additionally, the judgment provided that "all decisions regarding the care and upbringing of [C.H.], including education, medical care, and religious instruction, shall be made jointly by the parties" and that neither party could unreasonably withhold his or her consent to any proposed course of action. The judgment also required the parties to promptly communicate to each other information concerning C.H.'s education and to "notify each other as soon as possible in cases of emergencies, health care needs, or other significant child-related needed."

¶ 10     Further, the judgment required Bryan, who earned $300 per week, to pay to Billie $249 per month in child support.[2] Billie was responsible for providing C.H. with health insurance, and the parties shared equally the costs of school fees and uniforms, uncovered medical expenses, and childcare necessary for Billie to work. Billie was solely responsible for the costs of any extracurricular activity in which C.H. was enrolled.

¶ 11                    B. Postjudgment Proceedings

¶ 12     Just before the judgment was entered, Billie and C.H. moved to an apartment in Chicago. For a period of time, Bryan, who lives in Woodstock, exercised his daily parenting time at Billie's apartment, visiting with C.H. after school until Billie got home from work. However, at some point, Bryan stopped exercising his weekday parenting time and instead exercised his weekend parenting time but would keep C.H. until Sunday at 8 or 9 p.m. (as opposed to returning him, per

---

[1] Weekend visitation began at 5:30 p.m. if Friday was not a school day.

[2] The judgment stated that, during his closing argument, Bryan agreed to this amount.

the judgment, on Saturday at 6 p.m.). The parties apparently acquiesced to this modified arrangement, but neither sought a formal modification of the parenting-time schedule.

¶ 13    Billie lost her job in July 2021, and she sought and obtained employment in the Washington, D.C., area, where, because of her skills as an intellectual-property law paralegal, her opportunities were more abundant and better paying than they were in Chicago. Thus, Billie sought permission to relocate with C.H. to the Washington, D.C., area. The litigation that ensued was highly contentious, involving numerous, voluminous pleadings. It culminated in a hearing held over nine days in November and December 2021 and February and March 2022, in which the court heard testimony from the parties, C.H.'s guardian *ad litem* (GAL), Cynthia Lamb,[3] and Bryan's sister, Ann Sparks, and received numerous exhibits.

¶ 14                                    1. *The Relevant Pleadings*

¶ 15    As noted, the parties filed several pleadings and motions in relation to Billie's request to relocate. We set forth only those which Bryan challenges on appeal or provide context to the parties' dispute.

¶ 16                                    a. Billie's Filings

¶ 17    On August 2, 2021, Billie filed a notice of relocation accompanied by a petition. In the notice, Billie stated she intended to permanently relocate to the Washington, D.C., metropolitan area, she did not yet have an address for relocation, and relocation was necessary no later than September 1, 2021. In her petition, Billie asserted relocation was in C.H.'s best interests. She alleged she had recently found employment as an intellectual-property paralegal (a field in which she had been specializing for 13 years) in the Washington, D.C., area, where such jobs are more

---

[3] The trial court appointed Lamb as GAL on August 9, 2021.

abundant and paid better than in Chicago, because that is where the United States Patent and Trademark Office is located. Billie alleged that, under the judgment dissolving the marriage, she was primarily responsible for all costs associated with raising C.H., and Bryan had not paid any child support since the judgment was entered. She contended that, if relocation was allowed, she would be better able to provide for C.H.'s needs.

¶ 18     On August 18, 2021, Billie petitioned for an emergency order of protection, seeking an order protecting her and C.H. The trial court declined to hear the petition on an emergency basis and instead required notice to Bryan. On August 30, 2021, the court granted the petition, allowing Bryan to contact Billie (1) by email or text for the purpose of coordinating parenting time pickup and drop off, (2) by email for the purpose of discussing C.H.'s needs or parenting-related concerns, and (3) by phone in the event of an emergency. Otherwise, Bryan was prohibited from contacting Billie. The order of protection was set to expire upon the resolution of the pending petitions and motions related to Billie's relocation.

¶ 19     On October 8, 2021, Billie moved for an order allowing her to temporarily relocate to Washington, D.C. She alleged that she had accepted employment, under a short-term contract, in Washington, D.C., would earn only half of her expected income until she relocated, risked losing long-term employment if she did not relocate, and was living month-to-month in her current residence.

¶ 20     On October 12, 2021, Billie petitioned for an order holding Bryan in civil contempt. She alleged that Bryan had willfully and contumaciously failed to pay her any child support since the judgment dissolving their marriage was entered and that his current outstanding balance was $12,411.36, plus interest.

¶ 21                              b. Bryan's Filings

¶ 22   In response to Billie's petition to relocate, on August 10, 2021, Bryan moved to compel Billie to produce C.H. to testify at the hearing on her petition. Bryan also moved to modify the judgment, requesting that C.H. be placed with him, that he be allocated primary decisionmaking authority regarding C.H., and that Billie be ordered to pay to him child support. Bryan did not squarely allege a substantial change in circumstances had occurred. However, he alleged it was in C.H.'s best interests to be placed with him and that he believed C.H.'s placement with Billie seriously endangered C.H.'s mental, moral, and physical health or would significantly impair his emotional development. He based these contentions on allegations that C.H. had been bullied at his current school; Billie lived in a small, converted attic on the third floor of a building in a rat-infested neighborhood; C.H. was rapidly gaining weight; Billie consistently used abusive language, profanity, and corporal punishment when supervising C.H.; and both Chicago (where Billie and C.H. currently resided) and Washington, D.C., had been "wracked by civil unrest," had high violent-crime rates for nearly a century, and had widespread street gang activity.

¶ 23   On August 17, 2021, Bryan moved for temporary relief, asking the court to (1) modify the parenting schedule to provide him with visitation every Friday to Monday and unlimited telephone contact with C.H., and (2) abate his child-support obligation. Later, Bryan filed an "emergency amended motion for temporary relief," in which he added new factual allegations to support his requests for relief. Between the two pleadings, Bryan alleged Billie had been binge drinking on the weekends; on belief, Billie had a nonspecified personality disorder; Billie had recently capriciously terminated their verbal modification of the judgment (as it related to parenting time) and instead began enforcing the judgment to the letter; C.H. had become obese and sedentary while in Billie's care; C.H. had been missing school; and, on belief, Billie was emotionally abusing C.H.

¶ 24　On October 25, 2021, Bryan petitioned for an emergency order of protection in favor of C.H. He reiterated many of the factual allegations set forth in his amended motion for temporary relief, adding that C.H. had been psychiatrically hospitalized after an outburst at school that was, in fact, caused by Billie's emotional abuse and that Billie was alienating Bryan from C.H., by interfering with Bryan's parenting time. The court declined to hear the petition on an emergency basis, and the petition was ultimately heard at the same time as the other pleadings at issue in this appeal.

¶ 25　On November 12, 2021, Bryan petitioned for an order holding Billie in direct and indirect criminal contempt. Bryan alleged Billie made numerous false statements in open court and in certain verified pleadings and had also obstructed Bryan's visitation with C.H. On November 29, 2021, he amended his petition to include two additional counts of contempt: one based on Billie's obstruction of his participation in medical decisions relating to C.H., and one based on Billie's removal of C.H. from Illinois to the Washington, D.C., area.

¶ 26　Also on November 29, 2021, Bryan filed a second petition for an emergency order of protection. Bryan alleged that, after C.H. was discharged from his psychiatric hospitalization on November 9, 2021, Billie "fled" to Washington, D.C., in violation of C.H.'s "discharge safety plan." Bryan alleged that, while he was hospitalized, C.H. had violent outbursts with both Bryan and hospital staff, told hospital staff he did not feel safe with Billie, and was likely to have additional violent outbursts because Billie left the Chicago area, alienated Bryan from C.H., and emotionally abused C.H.

¶ 27　　　　　　　　　　　　　　　2. *The Hearing*

¶ 28　As noted, the trial court held a hearing over nine days in November and December 2021 and February and March 2022.

¶ 29                              a. Billie's Testimony

¶ 30    Billie testified that she is an intellectual property paralegal. After she lost her job in July 2021, her priority was to maintain C.H.'s stability and the relationships she had built in Chicago. She began looking for work both in the Chicago area and the Washington, D.C., area. Her options were limited, because of her experience and because she needed flexibility due to C.H.'s needs. Her skills overqualified her for an entry-level position, and an entry-level salary was not commensurate with her skills and would not sustain her and C.H.'s needs.

¶ 31    Billie obtained a job as a senior intellectual property paralegal with a firm that has offices in Washington, D.C., and California. The firm offered her a full-time position but, at the time of trial, the firm was allowing Billie to work remotely about 25 to 30 hours per week, for an annualized salary of $52,000. Billie explained that her current earnings could not sustain her and C.H.'s needs and that she was supplementing her income with her savings.

¶ 32    To be a full-time employee, the firm required that she live in Washington, D.C., or California. Billie chose Washington, D.C., for several reasons, including that it was closer to Chicago than is California. Upon relocation, Billie would become a full-time employee, earn $95,000, plus an annual bonus of at least $10,000, and receive health-insurance contributions from the firm. (She was paying the full premium as a part-time employee.) She would have flexible hours and expected to be allowed to work remotely on some days.

¶ 33    As part of her decision, Billie researched schools in Washington, D.C. She found Hearst Elementary School, which was a special-education school and was one of few that offered cluster services like C.H. was receiving in Chicago. (Billie explained that a cluster program grouped children with similar needs together so the school could pool its resources.) The school had a low teacher-to-student ratio and offered inclusive after-school programs. Billie did not know how

Hearst's general education program ranked compared to other schools in that area. However, its cluster-education program was highly rated. Billie focused her search for housing in neighborhoods that were served by Hearst. She had looked for a residence in three neighborhoods that were comparable to where she and C.H. lived in Chicago and verified with Hearst's administrator that those neighborhoods were served by Hearst.

¶ 34    The presence of a support system also influenced Billie's decision to choose Washington, D.C. She had made a significant number of friends in the area, through work, networking, and socializing, and C.H. knew children his age there. Billie's mother and stepfather, sisters and nephews, and grandmother lived in the same region of Pennsylvania, within 3½ hours of Washington, D.C. Billie's family, particularly her mother, stepfather, and sister, provided support to Billie after C.H. was born. Billie's sister, Penelope, has a son, Nicholas, who is two years older than C.H. and is also on the autism spectrum. According to Billie, C.H. and Nicholas are "compatible," meaning they communicated and played similarly and were able to interactively play. Before the Covid-19 pandemic, Billie and C.H. saw Billie's mother and stepfather frequently. They would travel to Illinois two or three times per year. They also saw Penelope and Nicholas semifrequently, sometimes taking vacations or spending a week together. During the Covid-19 pandemic, C.H. and Nicholas had regular contact via FaceTime. Billie testified that, if relocation was allowed, her mother would be able to see them every other week and Penelope and Nicholas "ha[d] plans to see [them] at least once a month." Nothing, other than Penelope's full-time employment, prevented Nicholas from visiting C.H. in the Chicago area. However, Billie believed that Penelope would not want to travel to Woodstock to allow Nicholas and C.H. to visit each other, because Penelope did not want to see Bryan.

¶ 35    Billie described her relationship with C.H. as "great." They had a routine and activities they liked to do together, and they shared meals together. Generally, Billie would allow C.H. to have input on certain matters, provided they were age appropriate, so that he would feel included. Billie sought to have an "open" relationship with C.H., so he feels like he is safe and "can talk about things." Billie mirrored her disciplinary tactics with those used at C.H.'s school and after-school program. Billie acknowledged she was not a "perfect parent." However, she was "caring, compassionate, [and] sympathetic," and she accommodated C.H.'s requests "whenever possible." She modeled good behavior for C.H. and demonstrated how to be a responsible adult by "go[ing] above and beyond in [her] career to make sure [she] ha[d] a network and a safety net so that [C.H.'s] life [could] continue to be provided for." Billie also acknowledged she had weaknesses as a mother, which included indulging C.H. "a little bit too much from time to time." C.H. never exhibited fear, apprehension, or avoidance while in Billie's care; however, C.H.'s diagnoses caused him to express emotions in an atypical manner.

¶ 36    C.H. occasionally asked Billie about the court case, but Billie did not discuss specifics. She never asked C.H. for help with the case, but believed others (presumably Bryan and Sparks) did ask for help, because C.H. had told Billie both that he was on her "team" and that he was on Bryan's "team." Billie told C.H. he did not need to be on anyone's "team," because the decision to be made was an "adult decision." On another occasion, C.H. asked Billie to help him turn on a camera, so that he could take pictures of her "mess" to help Bryan "win in court." Billie thus believed C.H. understood what was going on and felt compelled to help one side or the other. This, according to Billie, was contributing to C.H.'s anxiety.

¶ 37    Billie believed relocation to Washington, D.C., would be "good" for and have a positive impact on C.H., because they would be closer to Billie's family, would be financially stable, and

would have better opportunities. C.H. would have fewer transitions, since he would no longer be "shuffled back and forth" between Billie and Bryan. According to Billie, C.H. needed consistency because of his conditions. After relocation, Bryan could have contact with C.H. via videoconferencing, but she preferred it to be on a set schedule. Billie understood, however, there should be exceptions, *i.e.*, when C.H. was excited about something and wanted to tell Bryan.

¶ 38    Billie also recounted the events leading up to C.H.'s psychiatric hospitalization, which included two outbursts that occurred at school. On September 22, 2021, C.H. threw a pencil at an aid, drawing blood. On October 18, 2021, C.H. was in a fist fight with another student at his school. During the fight, C.H. told the other student he "would kill him" and "would kill his soul." C.H. later "eloped" from a multipurpose room, entered a supply closet, and swung a snow shovel at an aid's head. Another aid was able to stop C.H. C.H. then hid under a desk and flipped over a table.

¶ 39    The school's social worker told Billie the school "would be required to facilitate" a psychiatric evaluation if Billie did not seek one voluntarily. Billie thus called Lurie Children's Hospital and, on October 20, 2021, participated in a parent screening over the telephone. While she was on the call, C.H. physically attacked Billie. The screener told Billie that if C.H. had one more outburst, he would need to be brought to the emergency room for an "urgent evaluation for inpatient treatment." After another outburst later that day, Billie brought C.H. to the emergency room at Lurie, and he was referred for inpatient psychiatric services. However, he was on psychiatric hold in a regular hospital room for several days while he waited for a bed in the inpatient psychiatric unit.

¶ 40    While in the hospital, staff asked C.H. what he liked to do for fun, and he responded that he "t[ook] pictures of [Billie's] mess so that [Bryan] wins in court." He also told Billie, in front of hospital staff, that he was on Bryan's "team" and not Billie's. He also told hospital staff that Billie

was "mad" at Bryan but Bryan was "very nice." He also stated that he felt unsafe when he was with Billie, because he missed Bryan, but felt safe when he was with Bryan, because he did not miss Billie. C.H. continued to have violent outbursts during his hospitalization.

¶ 41    Billie acknowledged that, while C.H. was in the hospital, there was "an incident in which [Billie was] concerned about [Bryan] getting 20 minutes extra of visiting time with C.H." According to Bryan's pleadings, during those 20 minutes, he was speaking with hospital staff on a phone in C.H.'s room, discussing a care plan. Billie testified that she complained about Bryan having the additional 20 minutes of visitation and asked hospital staff what phone Bryan was using and requested telephone records. Billie did not believe her response was "over the top." Rather, she explained that she had been at the hospital nearly 24 hours a day and, per the plan put in place by hospital staff, she left at the agreed upon time so that Bryan could have time with C.H. Billie called the hospital several times and learned Bryan did not appear until "something like less than an hour before [he] was expected to leave." Billie was upset that, as a result of Bryan's tardiness, C.H. was "forced to be in the hospital alone during a medical crisis."

¶ 42    Eventually, on November 9, 2021, C.H. was discharged into Billie's care, with instructions to begin a partial hospitalization program. The discharge instructions also stated that C.H. was to have "no transitions" and "no stressors" until he was evaluated for that program. This meant C.H. was not to go from Billie's to Bryan's house or attend school. The doctors also recommended that C.H. take medication and undergo therapy for his generalized anxiety disorder. However, Bryan refused to consent to C.H. receiving that medication.

¶ 43    Billie took C.H. to Compass for evaluation on November 17, 2021. C.H. was not able to participate in the evaluation and instead hid behind Billie, climbed on furniture, rearranged the room, and picked up pieces of dust or lint from the floor. Given C.H.'s level of functioning,

Compass was unable to provide care for C.H. Instead, the doctor provided Billie with a list of providers that could assist C.H. However, none of those providers were in Billie's insurance network (as her employer-provided health insurance was centered in Washington, D.C.). Thus, Billie made an appointment with an in-network psychiatrist in Maryland, and she and C.H. traveled there on November 22, 2021, for that appointment. C.H. followed up with the psychiatrist on November 29, 2021, and again on December 6, 2021. The purpose of these three visits was to evaluate C.H. and determine the appropriate care going forward. The psychiatrist also prescribed medication for C.H.'s ADHD and an antianxiety medication for his generalized anxiety disorder. Billie unilaterally made the decision to put C.H. on the antianxiety medication, even though she knew Bryan had previously refused to consent to its use. And Billie did not consult with Bryan after C.H. was discharged, even though he had joint decisionmaking authority under the judgment. Billie explained that she went forward with the antianxiety medication because C.H. was nonfunctional and could not participate in a partial hospitalization program without it. At the time of the hearing, C.H. had not been treated in a partial hospitalization program. Billie, however, did not intend to treat C.H. only with medication; she intended to enroll C.H. in therapy when it was available.

¶ 44    C.H. continued to have violent outbursts after his discharge from Lurie. Billie testified, however, that the incidents were more isolated as a result of his treatment with the psychiatrist in Maryland. Additionally, C.H.'s speech had improved after he began taking medication. Billie explained that, previously, few people could understand what C.H. was trying to communicate, but, now, C.H. can better communicate to others his wants and needs.

¶ 45    Billie also testified that Bryan had attended only one of C.H.'s medical appointments since she and Bryan divorced. He had not attended any meetings relating to C.H.'s individualized education plan or parent-teacher conferences.

¶ 46    Billie communicated with Bryan "as little as humanly possible," because Bryan either harassed Billie or asked for money every time they talked. Billie did not tell Bryan about C.H.'s outbursts that led to his hospitalization. She explained, "I am not your wife. It's your responsibility to find out things you want to know about your child." According to Billie, coparenting meant that that she "need[ed] to do the things that are in the court order that [she] was legally required to do *** unless [she was] going to be unsafe, like allowing [Bryan] in [her] residence." Further, "[c]oparenting is when two people can actually communicate with each other without getting into a huge argument that leads to court filings every single time they speak." In the past, when Billie tried to share information with Bryan concerning C.H., Bryan criticized her and "it just snowball[ed] into everything that ever happened between the two of us." After the divorce, Billie attempted to amicably coparent with Bryan, but Bryan "used that opportunity to go through [her] things and to allow [C.H.] to make messes and then *** take pictures of them so that [he] c[ould] try to get custody of C.H. *** for the purpose of obtaining child support."

¶ 47    Billie frequently provided money to Bryan for transportation and/or meals so that Bryan could exercise his parenting time. Bryan had not paid any child support other than the first installment, which he paid on the date of the judgment. Bryan had not contributed to any of C.H.'s school or medical expenses (other than providing one ride to a clinic) and had not bought any clothing for C.H. Additionally, Billie provided C.H. with money to buy Bryan gifts, but Bryan, to Billie's knowledge, had not reciprocated. Billie was willing to waive child support so that Bryan could use that money to travel to Washington, D.C., to exercise parenting time.

¶ 48    At the time of the hearing, Billie and C.H. lived with Billie's sister in Pennsylvania. She moved because her lease in Chicago had expired, and she was waiting for the court to approve or disapprove her relocation to Washington, D.C., before obtaining permanent housing. C.H. continued to be enrolled at the school he attended in Chicago, but it "ha[d] no means to provide him instruction" given his condition. Billie had sent in paperwork to Chicago Public Schools to enroll C.H. in virtual instruction, but they had not yet enrolled him. The last time he had attended school was in October 2021. Billie had looked into the procedure for enrolling C.H. in school in Pennsylvania but had not formally initiated that process.

¶ 49    Billie considered alternatives before moving with C.H. to Pennsylvania. C.H. was in the middle of an emergent health crisis, however, and Billie's primary concern was C.H.'s best interests. Thus, she also spoke with the GAL, seeking advice as to whether the relocation to Pennsylvania was a viable option, given the limitations on care available to C.H. in the Chicago area.

¶ 50    Billie acknowledged that C.H. had gained weight since the start of the pandemic and had spoken with his pediatrician about it. C.H.'s pediatrician told Billie that this was a general trend with all her patients, which the pediatrician expected to subside when children were back in school full time. The pediatrician discussed with Billie strategies to avoid weight gain.

¶ 51    Billie occasionally socialized outside of work and sometimes drank alcohol. However, she never drank in front of C.H. and, maybe twice, had one drink after C.H. went to bed. She acknowledged, however, that she made several alcohol-related posts on her Facebook page.

¶ 52    Billie also acknowledged that she was currently blocking C.H. from visiting with Bryan and Sparks. She explained,

"[C.H.] just got out of an inpatient psychiatric unit at the age of nine where he spent 21 days ***.

The reason for his generalized anxiety disorder is psychosocial, meaning the relationship between me and you and you and him. He is, by your own admission in an email during visitation, being taken to [Sparks's] house and videotaped, interviewed, and otherwise interrogated *** so that you can, in your own words, I believe, paraphrasing slightly, collect evidence against me to use not only in this court case but in a criminal case of perjury against me. I don't think that that [*sic*] is an appropriate use of parenting time."

Billie was not blocking communication between C.H., Bryan, and Sparks, or between Bryan and C.H.'s physicians to conceal information. She explained that there was an order of protection that prohibited Bryan from calling Billie, except in the case of emergency, and that is why Bryan had not spoken with C.H. on the phone in the weeks leading up to the hearing.

¶ 53    Billie also testified that Bryan was exercising parenting time via videoconference during the proceedings. C.H. refused to turn on his camera, however. Billie encouraged C.H. to engage with Bryan but, if she left the room, he would follow her. When he did, Billie directed C.H. back into the room to continue his time with Bryan.

¶ 54                                  b. Bryan's Testimony

¶ 55    Bryan testified that he opposed Billie's relocation because it would dramatically decrease his parenting time with C.H. Under the judgment, he was entitled to daily face-to-face parenting time and, under the parties' unapproved modification of the judgment, he was exercising weekend parenting time each week, from Friday through Sunday afternoon. He was also concerned that Billie's relocation would prevent him from teaching C.H. certain skills that only he could teach him, such as how to "turn a wrench," throw a football, and ask a girl on a date.

¶ 56    At the time of hearing, Bryan was employed by a legal placement service called Special Counsel, which was based in New York. His net earnings were $150 per week. He also freelanced through upwork.com. He earned approximately $5000 in 2020 but earned much less in 2021. He had no other sources of income, but he received food stamps, rental assistance, utility assistance, and assistance from the local food banks and churches, who had provided secondhand clothing, blankets, shoes, and jackets for C.H. Bryan received health insurance from Medicaid and could have C.H. enrolled "within 24 hours." If Bryan were to obtain custody of C.H., he would rely on an increase in benefits from the Department of Human Services and child support from Billie and, if all else failed, he could rely on Sparks for support.

¶ 57    Bryan testified that he rented a house in a safe neighborhood in Woodstock that was close to the town square and several parks. C.H. had been to those parks and met new friends each time he did. Bryan felt comfortable allowing C.H. to walk to the square or park by himself and did not think that was inappropriate, because both police and security cameras were present in the area. C.H. loved to run for exercise, and there were plenty of nearby areas where he could do so.

¶ 58    According to Bryan, Billie preferred an urban environment, which did not compare favorably with Woodstock in this regard. Bryan testified that urban environments had gang activity and that C.H. was rapidly approaching an age where he would be susceptible to gang recruitment. C.H. would eventually need to learn how to be independent, and he could do so safely in Woodstock but not Chicago or Washington, D.C.

¶ 59    Bryan lived with two adult men, Mark Kobylinski and Chris Jacobs, both of whom had a nonviolent criminal history. Kobylinski had convictions for burglary, driving under the influence, and driving on a revoked license but none of his convictions were recent. Jacobs had a "[s]imilar, but shorter," criminal history. Kobylinski was a former member of the Hells Angels biker gang

but "was kind of a hanger" (which Bryan did not define). Kobylinski was a recovering alcoholic. Kobylinski attacked Bryan in April 2019, which was the last time Kobylinski drank. C.H. was not present at the time. Kobylinski only had "pleasant and appropriate" interactions with C.H. He taught C.H. some minor mechanical tasks. Jacobs occasionally drank alcohol, but never in C.H.'s presence or to the point of intoxication in the house. Another man, Christopher D'Asta, lived with Bryan in the past, but he moved out about two and a half years prior, after he attempted to stab Bryan. C.H. had been in D'Asta's presence at some point in the past.

¶ 60    Bryan explained that, in the past, he had tried "to fix people" who were struggling with issues like alcoholism and drug abuse. He was giving that up, however, as his sole focus now was to "fix" C.H.

¶ 61    According to Bryan, C.H.'s mental state had steadily deteriorated over the past four years that he was under Billie's care. He had become more anxious and apprehensive to the point he had been diagnosed with generalized anxiety disorder and had to be hospitalized. However, since the divorce, C.H. did not have violent outbursts or act aggressively when he was with Bryan. He did not show any signs of apprehension or anxiety. Bryan noted that Billie told hospital staff that she did not feel safe in C.H.'s presence, but Bryan never once felt unsafe with C.H.

¶ 62    Bryan treated C.H. with love, respect, and compassion. He had never raised his voice to C.H. or used corporal punishment, but instead used appropriate disciplinary tactics, such as giving C.H. a "time out" or denying him screen-time privileges. Bryan intended to teach C.H. how to play sports, to think independently, and to feel loved and respected, none of which he was receiving while under Billie's care. Bryan believed that Billie was binge drinking, as evidenced by several posts on her Facebook page.

¶ 63 Bryan provided C.H. with a healthy diet, and C.H. exercised when he was with Bryan. Billie, on the other hand, did not feed C.H. a healthy diet, and C.H. was becoming increasingly obese while in Billie's care. Bryan was diabetic and in the past had severe ulcerations on his legs, to the point where physicians had told him he was at risk of amputation. Bryan had recently lost weight and, through medication and exercise, had gotten his diabetes under control. He did not want C.H. to have a similar experience, which did not seem possible if C.H. were to continue to live with Billie.

¶ 64 Bryan further testified that, when he picked up C.H. for parenting time, C.H. "would jump for joy." On the ride back to Bryan's, C.H. "would bear hug [Bryan's] right arm for 30 to 45 minutes as we were driving away with his eyes tightly closed. [C.H.] *** appeared to be exhausted and extremely anxious." After they left Chicago's city limits, Bryan would tell C.H. that they are going to Woodstock and that C.H. would not be going back to Billie's apartment, and C.H. would open his eyes, begin to smile, and loosen his grip on Bryan's arm.

¶ 65 Before the end of Bryan's weekend parenting time, C.H. would call Billie and beg to stay with Bryan "just one more day," but Billie always said no. As they approached Billie's apartment at the end of Bryan's parenting time, C.H. became increasingly anxious and apprehensive, and, several times, he hid under the dashboard to avoid getting out of the car.

¶ 66 After Billie moved to Pennsylvania, Bryan began visiting with C.H. via Zoom and had repeatedly heard Billie telling C.H. to stop hitting her. According to Bryan, as C.H. continued to grow, it was "just going to get worse."

¶ 67 Bryan understood these as "consistent indications that [C.H.] did not want to go [back to Billie's]." Bryan had witnessed Billie using "a very harsh tone of voice" with C.H., and, in June 2021, he heard Billie tell C.H., "what [you] want[ ] means nothing." Bryan believed C.H.'s anxiety

and apprehension at the end of his parenting time was the result of Billie's verbal and emotional abuse of C.H.

¶ 68                                 c. Sparks's Testimony

¶ 69    Sparks testified that she is Bryan's younger sister and is a nurse who specializes in child psychiatry. She lives in Normal, Illinois, about a 2 hour and 45 minute drive from Woodstock. Neither Sparks nor Bryan wanted to present her as an expert, because there had been a complaint filed (presumably by Billie) against her with the Department of Professional and Financial Regulation, which alleged that she "assessed somebody out of the context of being a professional."

¶ 70    Sparks had observed Bryan and C.H. interact on multiple occasions. Bryan's home was appropriate for a child. Bryan provided three meals a day and had a yard in which C.H. could play. Sparks observed Bryan provide to C.H. love, encouragement, fun, safety, teaching, and socialization. Bryan was patient with C.H., kind, and inclusive. He also provided emotional support to C.H. and appropriately balanced the need to be "a buddy" to C.H. with the need to discipline him. Sparks never observed any abuse or neglect, and C.H. obeyed Bryan.

¶ 71    Sparks also observed Billie telling Bryan and C.H. what to say and how to say it during a videoconference. According to Sparks, Billie was "being abrasive."

¶ 72    Sparks testified that C.H. had gained significant weight in the year leading up to the hearing. He always "had rings under his eyes." On one occasion, Bryan took C.H. to visit Sparks. Bryan picked up C.H. at Billie's house and drove straight to Sparks's. When C.H. unpacked his bag, Sparks noticed that it contained mostly junk food. Sparks did not see clothing or a toothbrush. On one occasion, in 2021, Sparks drove Bryan to pick up C.H. from Billie's house. As they drove away, C.H. embraced Bryan, "kind of in a strange way." C.H. held the embrace for several minutes, "like he wasn't ready to let go."

¶ 73    Sparks had previously heard C.H. state he felt unsafe at Billie's house. In September 2021, after learning that Bryan had to physically carry C.H. into Billie's house at a parenting-time exchange, Sparks asked C.H. why he did not want to go into Billie's house. C.H. responded that "it was scary and that he was afraid."

¶ 74    Sparks also testified that she gave up a week's work and thousands of dollars in earnings to appear to testify, because she believed C.H.'s life was in danger, if not physically, then emotionally and spiritually. She did not understand why he had been taken out of state against a court order and "also against physician order that he's supposed to be in intensive outpatient hospitalization." She believed that Billie was acting contrary to C.H.'s best interests. She also believed that C.H.'s voice needed to be heard and that her testimony as to what she had observed needed to be heard.

¶ 75    Before this case, Bryan and Sparks had been estranged for about six years. Asked why they were estranged, Sparks testified that "there were issues of not being allowed to communicate, being told [Bryan] could not visit [Sparks]," and that, when she would call, she could hear Billie screaming in the background. They recently reconnected, however, and had become close.

¶ 76    During Sparks's testimony, Bryan introduced exhibits J and J1, which contained numerous recordings of C.H. created by Sparks. The recordings in exhibit J1 were made during Bryan's videoconference visitation that took place while the hearing was in progress and were made without Billie's and C.H.'s consent. Billie objected, arguing the recordings were hearsay. Bryan responded that the recordings were admissible under (1) the hearsay exception for a declarant's statement of his or her then-existing mental state or emotions (Ill. R. Evid. 803(3) (eff. Sept. 24, 2018)); or (2) section 606.5 of the Act (750 ILCS 5/606.5 (West 2020)), which provides that previous statements made by a minor relating to allegations of abuse and neglect are admissible as

evidence in hearings concerning the allocation of parental responsibilities. According to Bryan, while C.H. did not make specific allegations of abuse or neglect in the recordings, C.H.'s statements "indicate[d] neglect." Bryan ultimately submitted the exhibits to the court as an offer of proof. The court later determined that all of the recordings in exhibit J were inadmissible under the hearsay rule, finding C.H.'s statements, contained therein, did not meet the exception set forth in section 606.5 of the Act. As to exhibit J1, the court determined the recordings had been obtained in violation of the eavesdropping statute, rendering them inadmissible (720 ILCS 5/14-5 (West 2020)).

¶ 77                                    d. Lamb's Report and Testimony

¶ 78    Before the hearing, Lamb investigated the issues presented by the parties' pleadings and prepared a 29-page report of her findings and her recommendations. The report was admitted into evidence and stood as Lamb's direct testimony. After inquiry by the court, both parties were permitted to cross-examine Lamb.

¶ 79    In her report, details of which we address in our analysis, Lamb addressed each of the factors set forth in section 609.2 of the Act (750 ILCS 5/609.2 (West 2020)), which governs relocation petitions, and sections 602.5 and 602.7 of the Act (*id.* § 602.5, 602.7 (West 2020)), which govern the modification of a allocation judgments, and she recounted her findings in regard to each of those factors.

¶ 80    Ultimately, Lamb recommended that Billie be permitted to relocate with C.H. to Washington, D.C. She noted that, in addition to the applicable statutory factors, Billie's employment in Washington, D.C., would afford C.H. a better lifestyle and would allow Billie to maintain C.H.'s needs. Billie had always been C.H.'s sole source of financial support, and C.H.'s lifestyle could be negatively impacted if she was not able to relocate. Bryan, on the other hand,

had not shown any ability to provide financially for C.H. and did not "have the resources to provide for [C.H.'s] financial needs." Further, though Bryan claimed that he would enroll C.H. in a private school for children with autism, one-on-one therapy, and extra-curricular activities, his claim was disproved by the fact that he had done no such thing since the parties' divorce and had no financial ability to provide those things. Further, Lamb noted that Bryan had the ability to have reasonable parenting time "at approximately the same amount he now exercises on a monthly basis" and could do so in Washington, D.C., because he was minimally employed. Bryan could also have frequent, scheduled contact with C.H. via electronic means. Billie had indicated her willingness to forego child support so that Bryan could use that money for travel to and lodging in Washington, D.C.

¶ 81    Lamb also determined that, regardless of whether Billie was allowed to relocate, Billie should be granted sole decisionmaking authority for all major decisions involving C.H., including medical, school, extra-curricular, and religious decisions. Lamb noted that any regular contact between the parties had led to periods of harassment and cross-petitions for orders of protection and would not serve C.H.'s best interests. She also noted that the parties were often unable to make any decisions concerning C.H. because they could not discuss or come to an agreement. Lamb also noted that she never received any indication "that Billie has acted in any way other than [C.H.'s] best interest when making decisions for him." In her report, Lamb noted that Bryan and Sparks had recorded C.H. state that he loved Bryan and wanted to live with him but also noted that, when he came into the room during a phone call, Lamb had heard C.H. state make similar comments about Billie, specifically, that he would help her, not Bryan. Lamb noted that she did not give much weight to either statement, because C.H. loved both his parents, would like to live with each of them, and does not understand the ramifications of what relocation entails for him.

¶ 82    As to parenting time, Lamb recommended that Billie be allocated a majority of the parenting time, regardless of whether she was allowed to relocate. If Billie were allowed to relocate, Bryan should be allocated "extended weekends" in Washington, D.C., each month, along with regular contact via videoconference, so that he could maintain his connection with C.H. Lamb explained that "extended weekends" meant weekends that have an extra day off of school, which would allow Bryan to have three consecutive overnights per month as opposed to the four individual overnights per month that he was allocated in the original judgment. Lamb also noted that Bryan could have extended periods of time with C.H. over summer vacation, provided he could meet C.H.'s needs during those times.

¶ 83    If Billie was not allowed to relocate, Lamb recommended that the judgment be modified to remove Bryan's daily parenting time in favor of weekend parenting time, which he could exercise Friday through Sunday on alternating weekends. Lamb explained that the parties lived too remotely for weekday parenting exchanges and "that many transitions [did] not appear to be in [C.H.'s] best interest." She also determined that "it [was] not a workable solution, as proposed by Bryan, for Billie to vacate her own residence so he can visit with the minor child."

¶ 84                    3. *The Trial Court's Decision*

¶ 85    On May 2, 2022, the trial court entered a written order disposing of the pleadings at issue in this appeal, except that the court (1) did not rule on Bryan's motion to compel Billie to produce C.H.; and (2) appointed the State's Attorney to prosecute his amended criminal contempt petition. Relevant to this appeal, the court granted Billie's petition to relocate and denied Bryan's motion to modify the judgment. As part of that decision, the court modified the judgment to give Billie sole decisionmaking authority concerning C.H.'s health and modified the parenting-time schedule

to provide Bryan with visitation (1) one weekend per month,[4] to be exercised in Washington, D.C.; (2) in the summer (June, July, and August), one week per month, to be exercised in Woodstock; and (3) by videoconference for 30 minutes, three days per week. Additionally, the court abated Bryan's child support obligation, retroactive to the date Billie filed her relocation petition, so that Bryan could feasibly travel to and from Washington, D.C., to exercise his parenting time.

¶ 86    The trial court also denied Bryan's petitions for an order of protection in C.H.'s favor.

¶ 87    The trial court prepared a 38-page memorandum of its decision, in which it extensively recounted the evidence presented and set forth the bases for its decision. In relation to Billie's relocation petition and Bryan's motion to modify, the court set forth each of the factors in sections 602.5, 602.7, and 609.2 of the Act (750 ILCS 5/602.5, 602.7, 609.2 (West 2020)), explained how the evidence presented applied to those factors, and, ultimately, determined it was in C.H.'s best interests to grant Billie's petition to relocate.

¶ 88    The trial court emphasized that C.H.'s health was "a foremost concern" and that Billie's employment provided the means to provide for C.H.'s mental and physical health care. It noted Billie's job change was not the result of her leaving a current, existing job so that she could pursue a better opportunity. Nothing showed Billie could have stayed with her most-recent employer or turned down or failed to pursue opportunities that would have avoided relocation, and the court declined to assume Billie could have found employment that was commensurate with her experience and her and C.H.'s needs without relocating. The court thus found that requiring Billie

---

[4] The court ordered that, if possible, visitation should take place on a three-day weekend, and, in such cases, Bryan would be allowed to extend the weekend vacation to encompass the third day.

to stay in the Chicago area without employment and health insurance was contrary to C.H.'s best interests.

¶ 89    Further, the court noted that Billie had been C.H.'s primary caretaker for his entire life and "[i]t was not in [C.H.'s] best interest to upend that now." The court noted, regardless of its cause, treatment of C.H.'s aggression and anxiety was imperative. However, the parties had demonstrated they were unable to agree on the treatment of C.H.'s health needs, thus making necessary the modification of the healthcare decisionmaking authority.

¶ 90    The trial court also found that relocation would provide C.H. with better educational opportunities. Hearst, where Billie intended to send C.H., was highly rated and provided appropriate curriculum and structure for children with autism. Further, the court credited the GAL's opinion that Hearst could better meet C.H.'s needs over the options available in Bryan's area.

¶ 91                            4. *Posttrial Litigation*

¶ 92    In May 2022, Bryan moved to reconsider, which he later amended. In part, the motion asked for a new trial, arguing the trial court's refusal to hear testimony from C.H. was a "fatal flaw" that required a new trial. Additionally, Bryan partially based his motion on newly-discovered evidence. Specifically, Bryan asserted that, after the trial in this matter concluded, he discovered new evidence that established C.H. had not attended school or received therapy since November 2021, when Billie moved with C.H. to Pennsylvania. He alleged that Billie had "stonewalled" his attempts to gather information about C.H.'s education and healthcare. He also asserted that, since the trial court's order, C.H. had used aggressive and violent language toward him during his parenting time and that Billie was causing C.H. to act in that manner, which was an obstruction of his visitation.

¶ 93    Bryan also filed an "expert witness list" and later an "amended expert witness list," which stated that two witnesses would testify in support of his motion to reconsider: (1) Ryan Clancy, an investigator with Children and Youth Services in Pennsylvania, as an expert in child abuse and neglect cases, and (2) Sparks, as an expert in psychiatry and mental health.

¶ 94    At the hearing on the motion, both Clancy and Sparks were present. Bryan made an offer of proof as to each witness. According to Bryan, Clancy would testify that (1) C.H. had not attended school or therapy and had only one visit with a psychiatrist (to obtain prescriptions) since November 2021, when Billie moved with C.H. to Pennsylvania; and (2) Billie was uncooperative with his investigation, which signaled she "ha[d] something to hide." Sparks would testify that Billie continued to interfere with and obstruct Bryan's parenting time and continued to emotionally abuse C.H. while the matter was pending.

¶ 95    On July 7, 2022, the trial court denied the motion. With respect to Bryan's request for a new trial, based on the refusal to permit C.H. to testify, the court determined that Bryan abandoned his motion to compel Billie to produce C.H. by failing to present it and resting his case without bringing it to the court's attention. As to the newly-discovered evidence, the court noted that, to the extent the new evidence related to events that occurred after the proofs had closed and a decision had been issued, such evidence was not properly considered in a motion to reconsider. The court also noted that Bryan's offer of proof did not make clear whether Clancy and Sparks would testify as to events that predated the close of proofs and decision. However, to the extent the witnesses would testify as to events that predated the order, the court determined that Bryan had not established that he could not have discovered the evidence sooner. Bryan appeals.

¶ 96                                    II. ANALYSIS

¶ 97    On appeal, Bryan contends the trial court erred in (1) granting Billie's request to relocate, (2) denying his petitions for orders of protection, (3) excluding from evidence the video and audio recordings of C.H. that were created by Bryan and Sparks, and (4) denying his motion to reconsider. We must first address two preliminary matters.

¶ 98                          A. Illinois Supreme Court Rule 311

¶ 99    We have issued our decision outside the 150-day timeframe specified in Illinois Supreme Court Rule 311(a)(5) (eff. July 1, 2018), which states, "[e]xcept for good cause shown, the appellate court shall issue its decision within 150 days after the filing of the notice of appeal." Respondent filed his notice of appeal on August 5, 2022. Thus, the record on appeal was due in this court on September 9, 2022, Bryan's opening brief was due on September 30, 2022, and our disposition was due on January 3, 2023. See Ill. S. Ct. R. 311(a)(4), (5) (eff. July 1, 2018).

¶ 100   Bryan failed to timely file his opening brief, and, on October 5, 2022, on our own motion, we ordered him to file his brief no later than October 12, 2022, or else the appeal would be dismissed. The next day, Bryan moved for an extension of time to file his brief. His motion noted the trial transcript had not yet been prepared, that he had been in contact with the court reporter, and the court reporter informed him that two or three more weeks were needed to complete the transcripts.[5] He also asserted that, once the transcript was complete, he would need an additional

---

[5]Bryan's docketing statement (which was not timely filed) and his motion for extension of time both stated that he asked the circuit clerk to prepare the record on appeal on September 1, 2022, which was 12 days late. See Ill. S. Ct. Rs. 312(a), 323(b) (eff. July 1, 2017) (written request for transcript must be made within the time for filing the docketing statement, which must be filed within 14 days of the notice of appeal).

two weeks to review the transcript and file his brief. Thus, he sought an extension of time to November 10, 2022, to file his brief. Billie did not object to Bryan's motion, and, on October 12, 2022, we granted him the requested extension.

¶ 101   Bryan filed his brief on November 7, 2022. Although his brief referenced the trial transcript and several exhibits that were not included in the original record—and despite the fact it was his burden to ensure we had a complete record—Bryan never took any steps to supplement the record with a report of proceedings that included the trial proceedings and the exhibits. Thus, on November 17, 2022, on our own motion, we ordered the circuit clerk to certify the transcripts and exhibits as a supplemental record and file the supplemental record on or before November 22, 2022. The supplemental record was certified and filed on November 23, 2022. However, the exhibits, which include the video and audio recordings that, according to Bryan, were improperly excluded from evidence, were not transmitted to this court. Even after this court entered an order on January 11, 2023, instructing Bryan to submit, by January 19, 2023, the exhibits to the circuit clerk for submission to this court, he did not do so until January 25, 2023.

¶ 102   Billie's brief was due on December 1, 2022, and, after this court sent her a warning that it was overdue, Billie elected not to file a brief. Thus, the case was submitted for decision, on Bryan's brief alone, on December 15, 2022, which was 10 business days before the decision was due.

¶ 103   In light of the foregoing, we find we have good cause to excuse our failure to issue our decision within the timeframe set forth in Rule 311(a)(5). See *In re B'Yata I.*, 2013 IL App (2d) 130558, ¶ 26.

¶ 104                                      B. Lack of Appellee's Brief

¶ 105   We also note, that because Billie has not filed an appellee brief, our review is guided by the principles set forth in *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d

128 (1976). Under *Talandis*, when the appellee does not file a brief, the appellant is not entitled to a *pro forma* reversal, because "[a] considered judgment of the [circuit] court should not be set aside without some consideration of the merits of the appeal." *Id.* at 131. Rather, we have three distinct, discretionary options: we may (1) serve as an advocate for the appellee and decide the case if we determine justice so requires, (2) decide the merits of the case if the record is simple and the issues can be easily decided, or (3) reverse the circuit court when the appellant's brief demonstrates *prima facie* reversible error that is supported by the record. *Id.* at 133.

¶ 106   We conclude the record is simple and the issues presented can easily be decided without the aid of appellee's brief. Admittedly, the record in this case is quite voluminous. But volume alone does not render the record complex. And the issues presented in this appeal are neither novel nor complex. Accordingly, we choose to address the merits of Bryan's appeal notwithstanding the lack of an appellee's brief.

¶ 107        C. Billie's Relocation Petition and Bryan's Motion to Modify

¶ 108   Bryan first contends the trial court erred by granting Billie's relocation petition and denying his motion to modify the judgment. Specifically, he argues the trial court's best-interests determination was against the manifest weight of the evidence. Additionally, Bryan argues that he proved his allegations of criminal contempt by clear and convincing evidence and that the proper remedy for Billie's contempt is to grant primary residential custody to him.

¶ 109        1. *The Evidence Supported the Trial Court's Best-Interests Determination*

¶ 110   The trial court's chief concern when determining whether to allow a parent's relocation is the child's best interests. 750 ILCS 5/609.2(g) (West 2020). When determining whether relocation is in a child's best interests, the court must consider the following factors:

"(1) the circumstances and reasons for the intended relocation;

(2) the reasons, if any, why a parent is objecting to the intended relocation;

(3) the history and quality of each parent's relationship with the child and specifically whether a parent has substantially failed or refused to exercise the parental responsibilities allocated to him or her under the parenting plan or allocation judgment;

(4) the educational opportunities for the child at the existing location and at the proposed new location;

(5) the presence or absence of extended family at the existing location and at the proposed new location;

(6) the anticipated impact of the relocation on the child;

(7) whether the court will be able to fashion a reasonable allocation of parental responsibilities between all parents if the relocation occurs;

(8) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to relocation;

(9) possible arrangements for the exercise of parental responsibilities appropriate to the parents' resources and circumstances and the developmental level of the child;

(10) minimization of the impairment to a parent-child relationship caused by a parent's relocation; and

(11) any other relevant factors bearing on the child's best interests." *Id.*

¶ 111  "[A] trial court's determination of the child's best interests should not be disturbed unless it is clearly against the manifest weight of the evidence and it appears that a manifest injustice has occurred." (Internal quotation marks omitted.) *In re Marriage of Levites*, 2021 IL App (2d) 200552, ¶ 69. This deferential standard of review is appropriate because the trial court has a

superior opportunity to observe the parents and children, giving it the ability to assess and evaluate their temperaments, personalities, and capabilities. *Id.*

¶ 112   Further, "a best-interests determination cannot be reduced to a simple bright-line test and instead must be made on a case-by-case basis," and, thus, other relocation cases have limited comparative value because each case depends on its own unique facts and circumstances. *Id.* ¶ 71. Moreover, the result in a relocation case "cannot be reduced to a simply tally of which party 'won' a majority of the enumerated factors; instead, because some factors in a particular case may weigh more heavily than others, the trial court must consider all factors and evidence touching on the issue and must arrive at a reasonable result." *Id.*

¶ 113   We conclude the trial court's best-interests determination was not against the manifest weight of the evidence. The record demonstrates the trial court carefully considered all of the evidence presented and, in a detailed written order, explained how each of the relevant statutory factors applied to that evidence.

¶ 114   As to the first factor—the circumstances and reasons for the proposed relocation—the trial's findings were not erroneous. The court reasonably found that Billie's reason for relocation was the need to secure employment so that she could provide for her own and C.H.'s needs, particularly where Billie had always provided a majority of C.H.'s financial support. It also found that Billie had been unable to find comparable employment in the Chicago area. Specifically, Billie's reason for relocation was that she "was jobless and needed to secure new employment, for both her own sake and for [C.H.'s]." This factor favored relocation, the court determined. It noted that the GAL's finding that Billie did not find comparable employment in the Chicago area was consistent with Billie's testimony, which favored Billie. She lost her job and needed to secure new

employment, and Bryan failed to financially support C.H., "in spite of court orders providing for exactly that."

¶ 115 Turning to the second factor—the reasons, if any, why a parent is objecting to the intended relocation—we conclude that the trial court's findings were not erroneous. The court reasonably deterined that that Bryan's weekly parenting time would be diminished if Billie and C.H. relocated and that this was the strongest argument against relocation. The court noted that it could not credit Bryan's claims that Billie emotionally abused C.H., finding that lay testimony about C.H.'s emotional reactions did not constitute proof of emotional abuse, especially considering C.H.'s difficulty with transitions and communication. Likewise, a single statement that "what you want doesn't matter," without context, did not constitute emotional abuse. Finally, the court reasonably found that Bryan's argument that Woodstock was safer than Washington, D.C., or that a suburban setting was safter than an urban one was without foundation.

¶ 116 Next, addressing the history and quality of each parent's relationship with the child and whether a parent had substantially failed or refused to exercise the parental responsibilities allocated to them under the parenting plan or allocation judgment, the court found that both Billie and Bryan had a history of a good relationship with C.H. The court further found that Bryan's assertion that C.H.'s aggression toward Billie reflected the poor quality of their relationship was contradicted by other evidence concerning Bryan's own history with C.H. (the GAL reported that Bryan had testified at the hearing on Billie's first order of protection that C.H. was prone to violence and attacked his parents) and evidence that C.H. had been aggressive toward people besides Billie (such as students and staff at his school and staff at Lurie). Finally, the court found that Bryan had exercised less parenting time than allotted to him under the allocation judgment. The court's findings were not erroneous. The GAL noted in her report that Bryan had not paid

court-ordered child support or contributed to C.H.'s financial needs in any way except for when C.H. was with him. Billie reported that she often had supplied food and funds to Bryan so that C.H. would have things when he was with his father. The GAL concluded that Bryan was unable to financially care for his son, which affected his ability to exercise parenting time and other responsibilities for C.H.'s benefit.

¶ 117 Next, addressing the education opportunities for the child at the existing location and at the proposed new location, the trial court found that C.H.'s education would improve if he attended Hearst in Washington, D.C. This finding was not erroneous. The evidence, including the GAL's findings, showed that the Hearst autism program was highly rated, where it had therapists and special education staff on site, a low teacher-to-student ratio, and highly-rated cluster programming.

¶ 118 The court determined that the fifth factor—the presence or absence of extended family at the existing location and at the proposed new location—slightly favored Billie. The court noted that Billie did not have relatives near Chicago or Woodstock. Bryan's only nearby relative was Sparks, who lived in Normal, about three hours away. As the court noted, while Sparks and Bryan had seen each other more frequently during the litigation in this case, their relationship prior to this time was estranged and they did not have meaningful contact for several years. Billie's mother and sisters live near Washington, D.C., and Billie's mother had visited Chicago several times per year. Billie believed that the visits would increase if she and C.H. moved closer to her relatives. Further, one of Billie's sisters has an autistic son, and Billie noted he was C.H.'s most similar biological peer. The court reasonably determined that, based on this evidence, because contact with Billie's extended family will increase, the factor weighed slightly in favor of relocation.

¶ 119 Next, addressing the anticipated impact of the relocation on the child, the court found that the evidence did not establish what impact relocation either to Washington, D.C., or Woodstock would have on C.H. and that the factor did not weigh heavily in favor of either party. This finding was not erroneous. The GAL noted C.H.'s autism and concluded that it was unclear what impact relocation would have on him, but determined that, with proper planning and help, C.H. will probably be able to adjust to a new location and school. She also noted that the parties appeared to believe the same. The court noted C.H.'s need for ongoing treatment for autism and anxiety and that Billie's job in Washington, D.C., provided insurance there, where she was able to secure psychiatric help for her son after his hospitalization.

¶ 120 Next, addressing whether the court will be able to fashion a reasonable allocation of parental responsibilities between all parents if relocation occurs, the court correctly determined that a reasonable allocation of parenting responsibilities was possible if relocation occurs. It noted the parties' contentious history, but also the fact that they were able for several years to manage parenting time and decisionmaking for C.H.'s best interests with a schedule of their own making. The court acknowledged Billie's move to Pennsylvania without court approval and her giving C.H. medications without Bryan's consent or against his wishes. However, the court reasonably noted that her actions occurred in the midst of prolonged litigation, a change of job and benefits, and following an emergency hospitalization for C.H. Finally, the court reasonably found that Bryan's arguments concerning the ineffectiveness of C.H.'s medication, which, we note, he also raises on appeal, were not supported by any evidence at trial.

¶ 121 The court next addressed the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences to relocation. It noted that it did *not* take into account C.H.'s wishes, because he has autism and anxiety disorder and limited verbal

communication. Also, at different times, as the GAL noted, C.H. expressed a preference for both parents. We cannot conclude that the trial court erred in assessing this factor, as the record amply supported it findings.

¶ 122 The court found that the ninth factor—possible arrangements for the exercise of parental responsibilities appropriate to the parents' resources and circumstances and the developmental level of the child—weighed in favor of relocation. Its finding was not erroneous. The court reasonably found, based on the GAL's recommendation, that long parenting time each month was a reasonable allocation of parenting time, especially if combined with ongoing video communication during weekdays and extended time during the summer. Also, the GAL noted that there is a daily Amtrak train between Chicago and Washington, D.C., and the fare is $75 one-way. Given the long weekend parenting time and video communication, the evidence reasonably reflected that Bryan's relationship with C.H. could remain strong.

¶ 123 Addressing the tenth factor—minimization of the impairment to the parent-child relationship caused by a parent's relocation—the court found that it was not possible to avoid all impairment to Bryan and C.H.'s relationship as a result of relocation, but that it could be reduced in significant respects. This finding was not unreasonable. As the court noted, Billie offered to contribute to Bryan's travel expenses to Washington, D.C. by foregoing child support and contribution to child-related expenses. Further, the GAL noted that technology could help Bryan and C.H. maintain their relationship. She determined that Bryan would do whatever was necessary to maintain a relationship with C.H. and that they were both familiar with Zoom conferences.

¶ 124 In addition to the relocation factors, the court also assessed the factors relevant to the allocation of parenting responsibilities under section 602.5(c) (750 ILCS 5/602.5(c) (West 2020)

(decisionmaking)) and section 602.7 (750 ILCS 5/602.7 (West 2020) (parenting time)) of the Act that did not overlap with those addressed above.

¶ 125    Section 602.5(c) provides that, in determining the child's best interests for purposes of allocating significant decisionmaking responsibilities, the court shall consider all relevant factors, including:

"(1) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to decision-making;

(2) the child's adjustment to his or her home, school, and community;

(3) the mental and physical health of all individuals involved;

(4) the ability of the parents to cooperate to make decisions, or the level of conflict between the parties that may affect their ability to share decision-making;

(5) the level of each parent's participation in past significant decision-making with respect to the child;

(6) any prior agreement or course of conduct between the parents relating to decision-making with respect to the child;

(7) the wishes of the parents;

(8) the child's needs;

(9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement;

(10) whether a restriction on decision-making is appropriate under Section 603.10;

(11) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child;

(12) the physical violence or threat of physical violence by the child's parent directed against the child;

(13) the occurrence of abuse against the child or other member of the child's household;

(14) whether one of the parents is a sex offender, and if so, the exact nature of the offense and what, if any, treatment in which the parent has successfully participated; and

(15) any other factor that the court expressly finds to be relevant." 750 ILCS 5/602.5(c) (West 2020).

¶ 126 Section 602.7(b) of the Act provides that, in determining the child's best interests for purposes of allocating parenting time, the court shall consider all relevant factors, including:

"(1) the wishes of each parent seeking parenting time;

(2) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to parenting time;

(3) the amount of time each parent spent performing caretaking functions with respect to the child in the 24 months preceding the filing of any petition for allocation of parental responsibilities or, if the child is under 2 years of age, since the child's birth;

(4) any prior agreement or course of conduct between the parents relating to caretaking functions with respect to the child;

(5) the interaction and interrelationship of the child with his or her parents and siblings and with any other person who may significantly affect the child's best interests;

(6) the child's adjustment to his or her home, school, and community;

(7) the mental and physical health of all individuals involved;

(8) the child's needs;

(9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement;

(10) whether a restriction on parenting time is appropriate;

(11) the physical violence or threat of physical violence by the child's parent directed against the child or other member of the child's household;

(12) the willingness and ability of each parent to place the needs of the child ahead of his or her own needs;

(13) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child;

(14) the occurrence of abuse against the child or other member of the child's household;

(15) whether one of the parents is a convicted sex offender or lives with a convicted sex offender and, if so, the exact nature of the offense and what if any treatment the offender has successfully participated in; the parties are entitled to a hearing on the issues raised in this paragraph (15);

(16) the terms of a parent's military family-care plan that a parent must complete before deployment if a parent is a member of the United States Armed Forces who is being deployed; and

(17) any other factor that the court expressly finds to be relevant." 750 ILCS 5/602.7(b) (West 2020).

¶ 127 As to the wishes of each parent, the court found that Billie wanted to relocate to Washington, D.C., and wanted sole decisionmaking authority. She argued for a parenting time

schedule that gave Bryan extended weekends one time per month. Bryan wanted C.H. to live with him and Billie to have parenting time on extended weeks one time per month. Addressing the child's adjustment to his home, school, and community, the court found that C.H.'s lack of adjustment to Pennsylvania or Washington, D.C., weighed against relocation, especially given his autism and difficulty with transitions, but the court agreed with the GAL's concerns about the amount of freedom that Bryan gave C.H., such as walking alone to the Woodstock square and playing at the park. As to the amount of time each parent spent performing caretaking functions with respect to the child in the 24 months preceding the filing of any petition for allocation of parental responsibilities, the court determined that Billie had spent considerably more time performing caretaking functions. She cared for C.H. during the week and on any weekends in which Bryan's work schedule or transportation difficulties kept him from exercising parenting time. Billie also arranged for school and medical care. The court reasonably found this weighed strongly in her favor to remain the parent with the majority of parenting time.

¶ 128   Addressing the mental and physical health of all individuals involved, the court noted that it had already addressed C.H.'s mental and physical health. Addressing Bryan's issue with C.H.'s weight, the court reasonably found that there was insufficient evidence to find that his weight gain was a significant factor in this case (and this was supported by Billie's testimony), and it noted that the parents' health was not addressed at trial.

¶ 129   Next, addressing the ability of the parents to cooperate to make decisions, or the level of conflict between the parties that may affect their ability to share decisionmaking, the court noted that the evidence showed that Billie made nearly all of the decisions and there was no indication that the parties' ability to cooperate will improve after the litigation ends. This finding was amply supported by the record. As the GAL noted, the parties cannot cooperate in decisionmaking for

C.H. and have filed orders of protection against each other. Also, their combativeness contributed to the need for C.H.'s hospitalization at Lurie, and even Bryan had stated in his testimony for Billie's first petition for an order of protection that C.H. was prone to violent behavior and attacked his parents.

¶ 130    As to the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child, the court reasonably determined that neither party wanted to eliminate the other from C.H.'s life and that they were able to cooperate for parenting time after the dissolution.

¶ 131    Addressing the willingness and ability of each parent to place the needs of the child ahead of his or her own needs, the court found that both parties care for C.H. and want what is best for him, but the persistent conflict between them was affecting C.H. The court also noted that Bryan and Sparks had collected evidence for this case through C.H., most of which was barred when Billie objected to the video and audio contained in Bryan's exhibit J. It also noted that C.H. reported that he was collecting evidence for Bryan against Billie, which reflected that Bryan put his own needs ahead of C.H.'s needs. The trial court's findings were not unreasonable.

¶ 132    In summary, the trial court determined that relocation was in C.H.'s best interests and it granted Billie's petition and denied Bryan's motion to modify. The court noted that C.H.'s health was a foremost concern. Billie's employment provided both the financial means and insurance to provide for C.H.'s mental and physical health care needs. Billie's health insurance network does not include the Chicago area, but Billie found providers that meet C.H.'s needs in Maryland. Addressing Billie's job, the court found that requiring her to remain in the Chicago area without a job and without health insurance was not in C.H.'s best interests. There was no evidence that Billie

could have stayed at her prior employer, nor was there evidence that she failed to pursue a job opportunity that would have avoided relocation.

¶ 133   The court also noted that Billie had been C.H.'s primary caretaker for his entire life and that terminating that arrangement was not in his best interests. The parties could not resolve their reasonable disagreements to reach a joint decision about their son's health. The court noted that Bryan did not dispute that his involvement with C.H.'s school and medical appointments had been very limited. He argued that Billie had operated without his input, but no litigation history existed to reflect that he sought to enforce his decisionmaking authority.

¶ 134   The trial court allocated to Billie sole decisionmaking in health care issues and noted that Bryan would continue to have access to C.H.'s medical records and could consult with providers and attend appointments, so long as he did not interfere with or inhibit treatment. The court left in place other aspects of decisionmaking, including Bryan's ability to participate in decisions relating to education, religion, or extracurricular activities. The court determined that C.H.'s education would be better in Washington, D.C., noting the GAL's and Billie's testimony that Hearst is highly rated and provides a curriculum and structure appropriate for a student with autism.

¶ 135   It further determined that Bryan and C.H. could maintain a meaningful relationship after relocation, noting that neither party disputed that such a relationship could be maintained by a party travelling to C.H.'s residence for one long weekend each month. It allocated to Bryan one weekend per month with C.H., beginning on Friday after school and ending at 5 p.m. on Sunday, with a preference to Bryan for three-day weekends, during which his time would be extended to include the additional day. During summer, Bryan would have parenting time for one week each month, beginning on a Saturday at noon and ending on the following Saturday at noon.  The court also granted Bryan videoconference calls with C.H., with such calls to take place at 5:30 p.m. each

Tuesday, Thursday, and Friday, unless his parenting time fell on those days. It also granted Billie videoconference calls with C.H. according to the same schedule during Bryan's summer parenting time weeks. Addressing the GAL's opinion, the court found her credible, persuasive, and objective.

¶ 136 Finally, the court acknowledged that relocation will significantly reshape Bryan's relationship with his son and limit it. However, C.H.'s best interests, it found, were served by relocation, especially considering that it is possible for C.H. and Bryan to maintain a close and continuing relationship in spite of the geographic distance.

¶ 137 In his brief, Bryan does not address the statutory factors and complains about several evidentiary rulings. He also contends that he has a stable home, that reasonable visitation is impossible due to his limited financial resources, age (69 during trial), and health, and that Billie emotionally abuses C.H. and has not attended to his health care needs. Bryan cites several cases which he contends are similar to this case, arguing those cases compel an opposite conclusion than that made by the trial court. As noted, however, every relocation case must be decided on its own facts, so the case law cited by Bryan has little comparative value. *Levites*, 2021 IL App (2d) 200552, ¶ 71.

¶ 138 We conclude that the trial court considered all of the arguments and evidence and reasonably assessed and weighed the relevant factors and that its findings were not against the manifest weight of the evidence. Although, upon the parties' divorce, Bryan was granted liberal visitation with C.H., it was undisputed that, over time, he stopped exercising all of it. He also, with one exception, did not pay his agreed upon child support, being in arrears for over $12,000, plus interest, and did not contribute to C.H.'s school or medical expenses. Billie lost her job in July 2021, found employment in Washington, D.C., and sought permission to relocate there. Her job

as an intellectual property paralegal is specialized, and she found work as a senior intellectual property paralegal in Washington, D.C., the location of the United States Patent and Trademark Office, where she could earn over $95,000 per year if she worked full-time. She also found a special-education school there that offered highly rated cluster services like C.H., who has autism, was receiving in Chicago. Billie also had a support system near Washington, D.C., including not only friends, but also family in Pennsylvania (which includes her sister, who has a son who is on the autism spectrum), which had influenced her choice of Washington, D.C.

¶ 139   Bryan is employed part-time, earns a minimal salary, receives public assistance, and lives with two adult men, both of whom have felony convictions and one of whom has substance abuse issues. His objections to the relocation and his assertion that C.H. should be placed with him were based on his allegations that Billie was endangering C.H.'s mental and physical health, C.H. had missed a lot of school, and that living in an urban area such as Washington, D.C., or Chicago was unsafe for C.H. He also maintains that C.H. prefers to live with him, though the GAL overheard C.H. express a preference for Billie (and concluded that he loved both of his parents and would like to live with each of them). C.H., who had engaged in violent outbursts and was hospitalized, has generalized anxiety disorder and ADHD, for which he was prescribed medication and therapy. Billie reported that his outbursts decreased after therapy and that his speech improved after he began taking medication.  Further, as the court found, C.H. was in the middle of an emergent health crisis when Billie unilaterally decided to move to Pennsylvania. Finally, her testimony concerning C.H.'s weight gain reflected that his pediatrician expected it to subside when he returned to school full-time, similar to trends with other patients.  The trial court considered all of the evidence and, as noted, thoroughly assessed all of the relevant factors. We conclude that its findings were not erroneous.

¶ 140    2. *Billie's Alleged Criminal Contempt Does Not Compel a Change in Custody*

¶ 141   Bryan also argues that he proved by clear and convincing evidence his allegations of direct and indirect criminal contempt, specifically, that Billie removed C.H. from Illinois without prior court approval, interfered with his parenting time, and made false statements under oath. He asserts the appropriate remedy for Billie's contempt is a change in custody. We reject Bryan's argument for three reasons.

¶ 142   First, Bryan cites one case in support of his position, *In re Marriage of Almquist*, 299 Ill. App. 3d 732 (1988). *Almquist* did not involve a request to relocate or a request to modify an allocation of parental responsibilities and is, therefore, inapposite. Bryan otherwise offers no authority to support his assertion. See *Elder v. Bryant*, 324 Ill. App. 3d 526, 533 (2001).

¶ 143   Second, Bryan's argument on this point is wholly underdeveloped and is therefore forfeited. Illinois Supreme Court Rule 341(h)(7) states, "Points not argued are forfeited." Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). Bare contentions, without reasoned argument based on the record evidence and without citation of authority, are not enough to comply with the rule and do not merit consideration. *Hall v. Naper Gold Hospitality, LLC*, 2012 IL App (2d) 111151, ¶ 12. Further, this court is not a depository into which a party may dump the burden of argument. *Id.* ¶ 13. Bryan's argument is devoid of any discussion of the relevant court orders, pleadings, and testimony, and he does not explain how Billie's conduct was a contumacious violation of the trial court's orders.

¶ 144   Third, Bryan's argument overlooks the fact that the trial court deferred hearing Bryan's amended petition for criminal contempt and instead, after the hearing on the other matters concluded, appointed the State's Attorney to prosecute the matter, who ultimately declined to do so. Stated differently, while Bryan may have presented evidence that Billie violated the court's

orders, Bryan's amended petition for adjudication of direct and indirect criminal contempt was not at issue during the hearing.

¶ 145                    D. Bryan's Petitions for Orders of Protection

¶ 146   Bryan also contends the trial court erred by denying his petitions for orders of protection. His argument on this point states, in its entirety, as follows:

> "[T]he burden of proof for orders of protection is a preponderance of the evidence ***. Furthermore, proving emotional abuse of a child with speech difficulties is exceptionally difficult. For all these reasons, the Trial Court, *sua sponte*, should have allowed Group Exhibits J and J1 under the excited utterance exception to the hearsay rule, or found that the recordings contained sufficient allegations of abuse, due to [C.H.'s] speech difficulties, for admission under the statutory exception to the hearsay rule in the [Act]. And the orders of protection should have been granted."

¶ 147   Bryan's argument is wholly inadequate under Rule 341. He made no effort to develop a reasoned argument, supported by citation of authority and with reference to the relevant portions of the record. Accordingly, we conclude Bryan forfeited his contention that the trial court erred by denying his petitions for orders of protection.

¶ 148                         E. Motion to Reconsider

¶ 149   Bryan next contends the trial court erred by denying his amended motion to reconsider. Specifically, Bryan takes issue with the court's order as it related to his claim of newly-discovered evidence. He contends the information from Clancy was not discoverable and would have probably changed the outcome of the trial. (He makes no such argument as to the proposed testimony from Sparks.) He asserts the court should have heard the proposed testimony to determine whether it

would have changed the trial outcome, but the court did not "want to hear it" and instead denied his motion.

¶ 150    As an initial matter, we note Bryan's brief is devoid of any discussion of the standards applicable to motions to reconsider based on newly-discovered evidence. He cites one case, *People v. Washington*, 256 Ill. App. 3d 445 (1993), which involved proceedings under the Post-Conviction Hearing Act (Ill. Rev. Stat. 1989, ch. 38, ¶ 122-1 *et seq.*). He claims, without any citation of authority, that the same standards are applicable in this context. He has therefore forfeited his contention. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020); *In re Marriage of Reicher*, 2021 IL App (2d) 200454, ¶ 33.

¶ 151    Forfeiture aside, we find no error in the trial court's denial of Bryan's motion to reconsider. A motion to reconsider brings to the court's attention (1) newly-discovered evidence unavailable at the time of the hearing, (2) changes in the law, or (3) errors in the court's application of the existing law. *City of Chicago v. Eychaner*, 2020 IL App (1st) 191053, ¶ 37. Because such motions are matters for the court's discretion, we may reverse the court's decision only when it has abused its discretion. *Id.* An abuse of discretion occurs when the court's decision is unreasonable. *Blum v. Koster*, 235 Ill. 2d 21, 36 (2009).

¶ 152    Posttrial motions based on newly-discovered evidence are disfavored and, thus, courts must subject them to close scrutiny. *Eychaner*, 2020 IL App (1st) 191053, ¶ 37. When a party brings such a motion, he or she must establish that the new evidence is (1) so conclusive that it would probably change the outcome if a new trial is granted; (2) discovered after the trial; (3) could not have been discovered, with the exercise of due diligence, before trial; (4) material to the issue; and (5) not merely cumulative to the evidence already presented. *Id.* ¶ 38. The new evidence must have

been in existence at the time of trial or pertain to facts in existence at that time. *In re Marriage of Wolff*, 355 Ill. App. 3d 403, 410-11 (2005).

¶ 153   As to Clancy, putting aside the issue of whether Bryan could have discovered that evidence prior to trial, we conclude the trial court properly denied the motion because his testimony would have been cumulative to that which was already presented. According to Bryan's offer of proof, Clancy would have testified that he determined that C.H. had not attended school or therapy and had only one visit with a psychiatrist since November 2021. But, during Bryan's adverse examination of Billie, she acknowledged these facts as true. Essentially, Clancy would have provided evidence of which the trial court was already aware and Billie did not dispute.

¶ 154   As to Sparks, we again conclude the trial court properly denied the motion. Assuming, for the sake of argument, that Sparks would have testified as to Billie's alleged obstruction of Bryan's parenting time while the matter was pending (as opposed to obstruction that occurred after the trial court's decision), the evidence was not new because Bryan had first-hand knowledge of it, as the alleged obstruction occurred *during his parenting time*. Further, Sparks was Bryan's witness during trial and had knowledge of Billie's obstruction that purportedly occurred during the proceedings. Simply put, nothing prevented Bryan from presenting evidence of Billie's obstruction through his own or Sparks' testimony.

¶ 155   In sum, the "new evidence" that Bryan presented in his motion to reconsider was either known to Bryan or cumulative of that which was already presented at trial. Under these circumstances, we conclude the trial court's decision to deny Bryan's motion to reconsider was not an abuse of discretion.

¶ 156                          F. Video and Audio Recordings

¶ 157    Bryan's final contention is that the trial court erred by excluding from evidence several video and audio recordings of C.H. that were created by Bryan and Sparks. During trial, Bryan sought to admit group exhibits J and J1, arguing they were admissible, the hearsay rule notwithstanding, under section 606.5 of the Act (750 ILCS 5/606.5 (West 2020)). As to the recordings contained in exhibit J, he also argued they were admissible as statements of C.H.'s then-existing mental, emotional, or physical condition (Ill. R. Evid. 803(3) (eff. Sept. 28, 2018)). In his closing argument, Bryan alternatively asserted the recordings were admissible under the excited-utterance exception to the hearsay rule (Ill. R. Evid. 803(2) (eff. Sept. 28, 2018)). Here, Bryan argues that the two group exhibits, which contain several video and audio recordings, should have been admitted.[6]

¶ 158    Initially, we note that, in the trial court, Bryan filed a motion to compel Billie to produce C.H. to testify at the hearing on her petition. The trial court reserved ruling on the issue until the conclusion of the hearing and ultimately found that Bryan abandoned the motion by failing to present it before resting his case. On appeal, Bryan suggests that the court should have required C.H. to testify, but he does not squarely present that contention. Rather, he focuses on the video and audio recordings. Thus, we limit our discussion to those recordings.

¶ 159    Bryan argues—apparently in response to the trial court's finding that exhibits J and J1 were inadmissible because they were obtained in violation of the eavesdropping statute—that the

---

[6] During our initial review, we discovered that exhibits J and J1 were not contained in the record. On January 11, 2023, this court, on its own motion, entered an order directing Bryan to submit, by January 19, 2023, the exhibits to the circuit clerk for submission to this court. The exhibits were filed on January 25, 2023.

recordings were exempt from the eavesdropping statute, because either he or Sparks recorded the conversations under a reasonable suspicion that Billie was committing, about to commit, or had committed a criminal offense. See 720 ILCS 5/14-3(i) (West 2020). However, even assuming, for the sake of argument, the recordings were exempt from the eavesdropping statute, nowhere in the eavesdropping statute does it state that recordings that are exempt from the statute are admissible in evidence. Thus, Bryan would still have to demonstrate that the recordings—which were hearsay, that is, out-of-court statements offered for the truth of the matter asserted—were admissible under some exception to the hearsay rule.

¶ 160   Next, Bryan argues that the recordings should have been admitted under the excited-utterance exception to the hearsay rule.  A statement that would otherwise be inadmissible hearsay may be admitted as substantive evidence under the excited-utterance exception to the hearsay rule, if it "relat[es] to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Ill. R. Evid. 803(2) (eff. March 24, 2022). For a statement to be admitted as an excited utterance, the proponent must show an occurrence "sufficiently startling to produce a spontaneous and unreflecting" statement, the absence of time for the declarant to fabricate, and that the statement relates to the circumstances of the occurrence. *People v. DeSomer*, 2013 IL App (2d) 110663, ¶ 12. Courts analyze the totality of the circumstances to determine if the exception applies. *People v. Sutton*, 233 Ill. 2d 89, 107 (2009). "The totality of the circumstances analysis involves consideration of several factors, including time, the mental and physical condition of the declarant, the nature of the event, and the presence or absence of self-interest." *Id.* The critical inquiry is "whether the statement was made while the excitement of the event predominated." *People v. Smith*, 152 Ill. 2d 229, 260 (1992) (quoting Michael H. Graham, Cleary and Graham's Handbook of Illinois Evidence § 803.3 (5th ed. 1990)).

A trial court's evidentiary rulings on hearsay testimony and any applicable exceptions are reviewed for an abuse of discretion. *People v. Burney*, 2011 IL App (4th) 100343, ¶ 40. An abuse of discretion occurs where the trial court's ruling is unreasonable. *Id.*

¶ 161    The trial court did not abuse its discretion in determining that the exception did not apply. The video and audio exhibits do not depict any statements by C.H. that could be reasonably characterized as excited utterances, including two examples to which Bryan specifically points.  In the first example, he contends that C.H.'s statement that, "I don't trust my mom because she always lies," was admissible. However, in the recording, this statement is prompted by Sparks's question, "Is there anyone you don't trust?"  The totality of the circumstances reasonably reflects that the occurrence, *i.e.*, the conversation or questioning, was not startling in any sense; the parties' tone was conversational.  In a second example, recorded during a visitation, Bryan asks C.H. about a film he watched, which C.H. characterized as "scary."  Billie disagrees that it was scary, and C.H. responds, "I saw it with my own eyes."  Bryan argues that this recording was admissible and shows that Billie was emotionally abusing C.H.  We cannot conclude that C.H.'s comment during the disagreement over the film constituted a startling occurrence such that C.H.'s response was admissible.  Further, even if the second statement should have been admitted, we cannot conclude that Bryan was prejudiced as a result of its exclusion, as it cannot reasonably be argued that the court's best-interests determination would have been different had the recording been admitted.

¶ 162                                III. CONCLUSION

¶ 163    For the reasons stated, we affirm the judgment of the circuit court of McHenry County.

¶ 164    Affirmed.