2023 IL App (2d) 220421-U
No. 2-22-0421
Order filed June 2, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| BILLIE JO HINNEN, | ) | of McHenry County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| and | ) | No. 17-DV-343 |
| | ) | |
| BRYAN DEAN HINNEN, | ) | Honorable |
| | ) | Justin M. Hansen, |
| Respondent-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Birkett and Kennedy concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not err in denying respondent's motions to modify visitation and for a psychological evaluation of petitioner.  Affirmed.

¶ 2    The trial court entered a judgment, in August 2017, dissolving the marriage of petitioner, Billie Jo Hinnen, and respondent, Bryan Dean Hinnen.  The judgment incorporated the parties' agreed allocation of parental responsibilities and parenting plan, under which the parties' minor child, C.H., resided primarily with Billie.  In August 2021, Billie petitioned to relocate with C.H. to the Washington, D.C., area.  Highly contentious litigation followed, including Bryan's motion to modify the judgment, asking the court to place C.H. with him.  The trial court, on May 2, 2022,

granted Billie's petition to relocate and denied Bryan's motion and other pleadings. Bryan, *pro se* at all times in this case, appealed, arguing that the trial court erred in granting Billie's request to relocate and in ruling on various other pleadings. This court affirmed. *In re Marriage of Hinnen*, 2023 IL App (2d) 220280-U.

¶ 3        On June 23, 2022, Bryan moved to modify visitation, seeking modification of the court's May 2, 2022, order, alleging that Billie precluded, or interfered with, visitation. He also moved for a psychological evaluation of Billie (Ill. S. Ct. R. 215(d)(2) (eff. Jan. 1, 2018)), alleging that her behavior was negatively affecting C.H.'s emotional health and behavior, and he sought temporary transfer of custody to himself.

¶ 4        The trial court denied Bryan's motions. Bryan, *pro se*, appeals, arguing that the court erred in denying his motions. We affirm.

¶ 5                                    I. BACKGROUND

¶ 6        A. Evidence Elicited on Billie's 2021 Petition to Relocate & Bryan's Motion to Modify

¶ 7        The parties married in January 2001. C.H., born on June 27, 2012, is on the autism spectrum, which manifests in pervasive developmental delay and apraxia of speech, and he has attention-deficit/hyperactivity disorder and generalized anxiety disorder. (A copy of C.H.'s October 2020 Chicago Public Schools individualized education plan (IEP) is contained in the record.)

¶ 8        The parties divorced in August 2017. They came to an agreement on the allocation of parental responsibilities and a parenting plan and went to trial on other issues. The dissolution judgment incorporated their agreed allocation of parental responsibilities and parenting plan. The judgment assigned to Billie a majority of the parenting time but granted Bryan liberal visitation. Decisions concerning education, medical care, etc., were to be jointly made. Further, the judgment

required Bryan, who earned $300 per week, to pay Billie $249 per month in child support (which the record does not indicate that he ever paid), and Billie was responsible for paying for health insurance and extracurricular activities. The parties equally shared the costs of school fees, uncovered medical expenses, and childcare necessary for Billie to work.

¶ 9     Bryan lives in Woodstock, and, during postjudgment proceedings, Billie moved to Chicago. The parties acquiesced to modified parenting time. In July 2021, Billie, who worked as an intellectual-property law paralegal, lost her job. She sought and obtained employment in the Washington, D.C., area, where opportunities for someone with her skills were more abundant because that is the location of the United States Patent and Trademark Office. However, prior to moving to Washington, D.C., she temporarily moved, after Christmas 2021, to Pennsylvania to stay with her sister because, according to Bryan, she did not have funds to complete her relocation to Washington, D.C.

¶ 10     In August 2021, Billie petitioned to relocate with C.H. to the Washington, D.C., area. Highly contentious litigation ensued. The court heard testimony from the parties, C.H.'s guardian *ad litem* (GAL), Cynthia Lamb, and Bryan's sister, Ann Sparks.

¶ 11     Bryan, in turn, moved to modify the judgment, requesting that C.H. be placed with him and that he be allocated primary decisionmaking authority regarding C.H. and that Billie be ordered to pay him child support. He did not squarely allege that a substantial change in circumstances had occurred, however, he did allege that it was in C.H.'s best interests to be placed with him and that he believed C.H.'s placement with Billie seriously endangered C.H.'s mental, moral, and physical health or would significantly impair his emotional development. Bryan based his allegations on contentions that: C.H. had been bullied at his current school; Billie lived in a small, converted attic on the third floor of a building in a rat-infested neighborhood; C.H. was

rapidly gaining weight; Billie consistently used abusive language, profanity, and corporal punishment when supervising C.H.; and both Chicago and Washington, D.C., had been "wracked by civil unrest," had high violent-crime rates for nearly a century, and had widespread street gang activity. In a subsequent pleading, Bryan alleged that Billie had been binge drinking on weekends, had a nonspecified personality disorder, and that C.H. had been missing school. He also alleged that C.H. had been psychiatrically hospitalized after an outburst at school that was caused by Billie's emotional abuse and that Billie was alienating Bryan from C.H. by interfering with Bryan's parenting time. Bryan also alleged that, after C.H. was discharged from his psychiatric hospitalization on November 9, 2021, Billie "fled" to Washington, D.C., in violation of C.H.'s "discharge safety plan." According to Bryan, C.H. told hospital staff that he did not feel safe with Billie.

¶ 12    During the hearing, Billie testified that she lost her job in 2021 and began looking for work in both Chicago and Washington, D.C., with her priority being to maintain C.H.'s stability and the relationships he had built in Chicago. She obtained a job in Washington, D.C., that would pay $95,000 full time, plus an annual bonus of at least $10,000 and health-insurance contributions from the firm. She researched schools in the Washington, D.C., area and found Hearst Elementary School, which is a special-education school with cluster services like C.H. was receiving in Chicago. The program is highly rated. (At the time of her testimony, an IEP meeting was upcoming at Hearst, but, in the meantime, Hearst was operating under the Chicago Public Schools IEP.) Billie had a support system in the area and family in Pennsylvania within 3½ hours of Washington, D.C. Billie was willing to waive child support so that Bryan could use that money to travel to Washington, D.C., to exercise parenting time.

¶ 13    Billie believed she had a "great" relationship with C.H.  C.H. had told her both that he was on her "team" with respect to the court case and that he was on Bryan's "team."  Billie did not discuss the specifics of the case with C.H. but believed others (presumably Bryan and Sparks) did.

¶ 14    Because of his conditions, C.H. needed consistency, which a move to Washington, D.C., would provide.  C.H. had two outbursts at school in September and October 2021, which included throwing a pencil at an aid and drawing blood and engaging in a fist fight with another student and stating that he would kill him.  Billie contacted Lurie Children's Hospital in Chicago, and C.H. was ultimately admitted to the inpatient psychiatric unit.  While in the hospital, C.H. made statements indicating a preference for Bryan and stated that he was on Bryan's "team," not Billie's. He continued to have violent outbursts during his hospitalization.

¶ 15    On November 9, 2021, C.H. was discharged with instructions to begin a partial hospitalization program and have "no transitions" or "stressors."  This meant that he was not to go from Billie's to Bryan's house or attend school.  The doctors also recommended that C.H. take medicine and undergo therapy for his generalized anxiety disorder.  Bryan, however, refused to consent to C.H. receiving that medication.  An evaluation at Compass Health Center in Chicago could not be performed in November 2021 because C.H. hid, climbed on furniture, etc.  Billie was given a list of providers who could assist C.H. but they were not in her insurance network (her insurance was centered in Washington, D.C.).  Thus, she took C.H. to Maryland to see an in-network psychiatrist.  After three visits, the psychiatrist prescribed medication for C.H.'s ADHD and an antianxiety medication for his generalized anxiety disorder. Billie unilaterally decided to put C.H. on the antianxiety medication.

¶ 16    C.H. continued to have violent outbursts after his discharge from Lurie but they were less frequent as a result of his treatment, and his speech improved after he began taking the medication.

¶ 17    Billie testified that she communicated "as little as humanly possible" with Bryan, because Bryan either harassed Billie or asked for money. She did not tell Bryan about C.H.'s outbursts that led to his hospitalization.

¶ 18    Billie completed paperwork to enroll C.H. in virtual instruction in the Chicago Public Schools but they had not yet enrolled him. C.H. had gained weight since the start of the pandemic, and Billie had spoken to his pediatrician about it. The pediatrician reported that this was a general trend with her patients, which she expected to subside once children were back in school full time.

¶ 19    Billie blocked C.H. from visiting with Bryan and Sparks, explaining that, at Sparks's house, he is videotaped, interviewed, and interrogated to collect evidence against Billie. Bryan exercised parenting time via videoconference during the proceedings, but C.H. refused to turn on the camera.

¶ 20    Bryan testified that he opposed the relocation because it would dramatically decrease his parenting time with C.H. Bryan was employed by a legal placement service and earned $150 per week. He also received food stamps, rental assistance, utility assistance, and assistance from local food banks and churches. Bryan received health insurance from Medicaid and could have C.H. enrolled "within 24 hours." He rented a house in a safe neighborhood in Woodstock that was close to the town square and parks. Bryan lived with two adult men, both of whom had a nonviolent criminal history and one of whom was a recovering alcoholic.

¶ 21    Bryan believed that C.H.'s mental state had steadily deteriorated over the past four years that he was under Billie's care. However, since the divorce, C.H. did not have violent outbursts or act aggressively when he was with Bryan. Bryan provided C.H. with a healthy diet, and C.H. exercised when he was with Bryan. Bryan believed that Billie did not feed C.H. a healthy diet. Bryan further testified that, when he picked up C.H. for parenting time, C.H. "would jump for joy"

and would tell Bryan that he would not be going back to Billie's apartment. As they approached Billie's apartment at the end of Bryan's parenting time, C.H. became increasingly anxious and apprehensive. Bryan believed that Billie emotionally and verbally abused C.H.

¶ 22 Sparks, who is Bryan's younger sister and a nurse who specializes in child psychiatry, testified that she lives 2 hours and 45 minutes from Woodstock. Sparks had observed Bryan and C.H. interact on multiple occasions. Bryan provided an appropriate home for C.H. and was patient, kind, and inclusive. He also provided C.H. emotional support, love, encouragement, fun, safety, teaching, and socialization.

¶ 23 Sparks observed Billie telling Bryan and C.H. what to say and how to say it during a videoconference. She was "abrasive." C.H. had gained significant weight in the year leading up to the hearing and had rings under his eyes. She had previously heard C.H. state he felt unsafe at Billie's house.

¶ 24 Lamb's GAL report served as her direct testimony, and she sat for cross-examination. Lamb conducted interviews (in person, telephonically, and via Zoom), had conversations with C.H. via Zoom, and spoke to medical personnel. She also listened to audiotapes, watched videos, reviewed photographs, and read additional documentation provided by the parties and other witnesses. Lamb also reviewed emails, police reports, medical records, school records, court filings, and public records.

¶ 25 Lamb recommended that Billie be permitted to relocate with C.H. to Washington, D.C. Billie's employment there would afford C.H. a better lifestyle and allow Billie to maintain C.H.'s needs. Billie had always been C.H.'s sole source of financial support, and C.H.'s lifestyle could be negatively impacted if she was not able to relocate. Bryan, however, had not shown any ability to provide financially for C.H. and did not have the resources to provide for his needs. Although

Bryan claimed that he would enroll C.H. in a private school for children with autism, one-on-one therapy, and extra-curricular activities, his claim was disproved by the fact that he had done no such thing since the parties' divorce and had no financial ability to provide those things. Lamb further noted that Bryan had the ability to have reasonable parenting time at about the same amount he currently exercised on a monthly basis and could travel to in Washington, D.C, because he was minimally employed. He could also have regular contact via electronic means.

¶ 26    Lamb recommended that Billie be granted sole decisionmaking authority for all major decisions involving C.H. She noted that she never received any indication that Billie acted in any way other than in C.H.'s best interests. Bryan and Sparks had recorded C.H. saying that he loved Bryan and wanted to live with him, but Lamb also heard C.H. make similar comments about Billie. Lamb did not give much weight to either statement because C.H. loved both of his parents, would like to live with each of them, and does not understand the ramifications of what relocation entails for him.

¶ 27                    B. Trial Court's Order & Bryan's First Appeal

¶ 28    On May 2, 2022, the trial court granted Billie's petition to relocate and denied Bryan's motion to modify the judgment. The court granted Billie sole decisionmaking authority concerning C.H.'s health and modified the parenting-time schedule to provide Bryan with visitation (1) one weekend per month, to occur in Washington, D.C.; (2) in the summer (June, July, and August), one week per month, to occur in Woodstock; and (3) by videoconference for 30 minutes, three days per week. The court abated Bryan's child support obligation, retroactive to the date Billie filed her relocation petition, so that Bryan could travel to and from Washington, D.C., to exercise his parenting time.

¶ 29    The court found that Billie's job change was not the result of her leaving her employment so she could pursue a better opportunity. Requiring her to stay in the Chicago area without employment and health insurance was contrary to C.H.'s best interests. Billie had been C.H.'s primary caretaker for his entire life, and it was not in his best interests to change that. The parties had demonstrated that they were unable to agree on the treatment of C.H.'s health needs, thus, making necessary the modification of the healthcare decisionmaking authority. The court further found that relocation would provide C.H. with better educational opportunities. Hearst was highly rated and provided appropriate curriculum and structure for children with autism. The court credited the GAL's opinion that Hearst could better meet C.H.'s needs over the options available in Bryan's area.

¶ 30    Bryan appealed, and this court affirmed. *In re Marriage of Hinnen*, 2023 IL App (2d) 220280-U.

¶ 31    C.  Bryan's 2022 Motions to Modify Visitation and for Psychological Evaluation of Billie

¶ 32    On June 23, 2022, Bryan moved to modify the court's May 2, 2022, order. He sought visitation at his residence in Woodstock between July 9 and July 31 and between August 5 and August 13.

¶ 33    On July 6, 2022, the trial court entered an amended judgment of allocation of parental responsibilities and parenting plan, which it had directed in its May 2, 2022, order.

¶ 34    On August 1, 2022, Bryan filed an emergency motion to modify visitation, alleging that Billie had refused to provide him with her new address or the date of her move. Bryan discovered Billie's address in Pennsylvania (where she had moved after Christmas 2021) and traveled there for visitation and, upon his arrival, was told by someone that Billie had relocated with C.H. to Washington, D.C. He also asserted that, due to Billie's refusals, he had not been able to exercise

the visitation to which he was entitled. Bryan alleged that there had been a substantial change in circumstances in that Billie had concealed C.H. and relocated with him with no notice or provision of new address to Bryan and had failed to provide C.H. with education or adequate psychiatric or health care. The trial court, on August 4, 2022, determined that Bryan's motion was not in the nature of an emergency and continued it for hearing.

¶ 35　Hearings on Bryan's new motions occurred in August, September, and October 2022. Bryan's position was that, on or about May 18, 2022, C.H. became verbally abusive toward Bryan, where he had previously been respectful, loving, and gentle toward his father. On several occasions, C.H. threatened to kill Bryan and called him foul names. Billie, according to Bryan, berated C.H., telling him not to hit her or to stop hitting her. Bryan argued that it was not in C.H.'s best interests to remain with Billie.

¶ 36　Bryan also asserted that, on July 9, 2022, he travelled with Sparks to Phillipsburg, Pennsylvania, to exercise visitation, but, instead of being met by C.H., a female relative of Billie's appeared with a gun in her hand, pointed it at Bryan, and stated that C.H. was in Washington, D.C., and that Bryan was not welcome in Pennsylvania. Bryan also asserted that the evidence would show that he and Sparks had been interviewed by Ryan Clancy of the Department of Children and Youth Services of Center County, Pennsylvania, who had issued a report concerning allegations that C.H. had not attended school or therapy. He had tried to interview Billie, but she had refused to cooperate. Clancy had closed the case.

¶ 37　Bryan also argued that the evidence would show that, on July 9, 2022, he and Sparks travelled to Washington, D.C., and had arranged in advance to pick up C.H. for extended visitation. At the pickup at the National Zoo, C.H. struck Bryan in the head with an object, drawing blood and then running into the crowd. Billie had hugged the child. Finally, Bryan asserted that the

evidence would show that Billie had been verbally abusive toward Bryan and C.H. and had been abusive in writing toward Bryan.

¶ 38    Billie's counsel argued that Bryan would not be able to present competent evidence supporting his allegations. Counsel noted that in-person parenting time had not been exercised due to Bryan's cancellations, his arrival at the wrong location to exercise his time, and C.H.'s condition.

¶ 39    During the proceedings, Bryan, on October 12, 2022, moved for a psychological evaluation of Billie under Illinois Supreme Court Rule 215(d)(2) (eff. Jan. 1, 2018). He attached Sparks's affidavit. Sparks, a board-certified mental health nurse practitioner and an advanced practice registered nurse, averred, as relevant here, that Billie demonstrated "obvious delusions, paranoia, grandiosity, and other mental health symptoms of significant consequence, suggesting a possible Cluster B personality disorder, likely directly causing the observable, profound deterioration of [C.H.'s] behaviors." Sparks referenced the Zoom visitations and Billie's alleged interruptions and argumentativeness and C.H.'s use of aggressive language and alcohol references, which she asserted mirrored language Billie used in e-mail communications and likely reflected coaching. Sparks further averred that she had personally observed, over decades, Billie's delusional, paranoid, and grandiose behaviors and had recommended, in December 2005, Billie be evaluated and treated for delusions and extreme behaviors. Sparks also argued that Billie's claims that Bryan is not C.H.'s father, her statement that she does not read his e-mails and has blocked his phone number, and her refusal to give him her apartment number were "clear evidence of significant psychopathology."

¶ 40                                  1. Ann Sparks

¶ 41    Sparks testified that she has been a nurse for 35 years and is a registered nurse, advanced practice nurse, and has certification in family and psychiatry. She has treated nearly 1000 psychiatric patients and over 10,000 patients as a nurse practitioner. The court admitted Sparks as an expert witness in psychiatric mental health nurse practitioner, family nurse practitioner, and registered nurse.

¶ 42    During the past five years, Sparks has observed changes in C.H.'s behavior. He has changed from being a sweet boy who is able to say thank you to one who threatens to kill his father and calls him a moron and "fucking psychopath." In the preceding six months, he started acting out aggressively and hitting. He also asked for alcohol multiple times and became agitated when Bryan told him he could not have alcohol. Prior to these changes, C.H. appeared excited to see Bryan during visitation pickups, although he seemed exhausted and would nap within a few minutes of pickup.

¶ 43    Sparks observed C.H. on August 6, 2022, at the zoo in Washington, D.C., and, as compared to her observations in 2021, C.H. appeared to be significantly more overweight.

¶ 44    Sparks testified that, during video visitations, Billie remains in the room, "screaming" at C.H., and C.H. screams back at her. Bryan tried to deescalate the visits. Since August 2021, Billie began terminating the video visits if Sparks was in the background. Also, since that period, C.H. has always appeared comfortable at Bryan's house.

¶ 45    Addressing autism, Sparks testified that clutter and disorganization increase anxiety in autistic children. Thus, it is more therapeutic to live in a clean, orderly environment with routine. Sparks has visited Bryan's home over one dozen times in the past five years and described it as clean and very appropriate. It is a suitable home for a father and child. It also has a yard and is

close to the Woodstock Square. According to Sparks, Bryan has not had a roommate in several months. His most recent roommate moved to a nursing home.

¶ 46 Sparks also addressed the visit to Pennsylvania. Sparks and Bryan knocked on the door, but no one answered. They waited in their car, and a woman pulled up in a white car behind them. Bryan exited the car and started walking to the house, but the woman exited her vehicle and approached him, carrying a gun and asking if he was Bryan. When Bryan responded that he was there to pick up his son, the woman stated that C.H. was in Washington, D.C., and that Bryan was not welcome "here." She pointed the gun in Bryan's general direction and refused to identify herself. Bryan and Sparks left. Sparks did not feel safe during the encounter. The woman, according to Sparks, had facial features similar to Billie's; there was a family resemblance.

¶ 47 Next, Sparks addressed a visit to Washington, D.C., on August 6, 2022. She and Bryan travelled there to pick up C.H. at noon at the zoo. Police officers were nearby, because Bryan had called ahead of time to ask for police escort given the incident in Pennsylvania. They saw Billie and C.H. approach their car, and C.H. appeared hesitant. C.H. hit Bryan on the shoulder with a bag. (The bag contained toiletries, a pill planner, and loose pills.) C.H. entered Bryan's car for a few seconds and then exited. C.H. walked to the zoo entrance, and Bryan and Billie followed him. C.H. then hit Bryan a second time, drawing blood. Billie held out her arms for a hug, and C.H. then hugged Billie and disappeared around the corner for 15 or 20 seconds. In Sparks's view, Billie's actions—rewarding negative behavior—were not appropriate.

¶ 48 Since May 2, 2022, Sparks has observed about seven or eight video visits. About 50% of the time, neither Billie nor C.H. show up for the visitations after Bryan has turned on his camera. During the visits when C.H. has appeared, Sparks has heard Billie's voice in the background. She bickers with Bryan, telling him and C.H. what to say and what not to say. During one visit in June

or July 2022, Billie argued with C.H. about whether he should feel a certain way about a movie. She should not have been in the room, and children have a right to their feelings.

¶ 49 Addressing a May 18, 2022, e-mail exchange between Bryan and Billie, Sparks opined that it showed symptoms of mental illness on Billie's part. Billie stated in the e-mail that C.H. is not Bryan's child and that Bryan is a psychopath. Sparks believes that C.H. needs an inpatient hospitalization due to his aggression, threats to kill, and his lashing out and hitting Bryan. Sparks believes that C.H. would be safer and more well-rounded if he were placed with Bryan. He currently lacks appropriate emotional support, education, and therapy.

¶ 50 On cross-examination, Sparks testified that, since May 2022, she has observed Billie, but has not examined her. She knows that certain symptoms belong to a group of diagnoses, but she cannot diagnose any condition. Sparks has not conducted any clinical assessments of either Billie or C.H. Since May 2022, except for the events at the zoo, Sparks has not been in Billie or C.H.'s presence. On August 6, 2022, at the zoo, she was in C.H.'s presence for 12 to 15 minutes. Sparks has never been inside C.H.'s Chicago, Pennsylvania, or Washington, D.C., residences.

¶ 51                                    2. Bryan

¶ 52 Bryan testified that, prior to August 6, 2022, the last time he saw C.H. in person was on November 6, 2021, at Lurie. Between November 6, 2021, and May 18, 2022, C.H. remained respectful, gentle, and affectionate during Zoom visitations with Bryan. Beginning around May 18, 2022, C.H.'s behavior changed, and he stated that he hated Bryan, showered him with profanities, called him names, and claimed that Bryan was not his father.

¶ 53 Bryan told Billie that he would be exercising visitation in July 2022 in Pennsylvania. Billie never informed Bryan that she was moving to Washington, D.C. The woman who approached

Bryan and Sparks looked very much like Billie's younger sister, whom Bryan had met 22 years earlier.

¶ 54    During the summer of 2022, Bryan tried to schedule visitation with C.H. but was unable to do so with Billie or her counsel, as he either received no responses or rejections. Bryan also inquired as to why C.H. had not been in school or therapy. His questions were ignored.

¶ 55    On cross-examination, Bryan testified that he informed Billie that he would not be able to begin his first scheduled visitation in June 2022. When Bryan traveled to Pennsylvania, that was *after* Billie was given leave by the court to relocate to Washington, D.C. Prior to traveling to Pennsylvania, Bryan did not ask Billie what her address was in Washington, D.C., or whether she had moved there.

¶ 56                                     3. Ryan Clancy

¶ 57    Clancy testified that, in May and June 2022, he investigated a referral with concerns about Billie and C.H.; specifically, that C.H. had not been attending school, needed autism services, and concerns about Billie abusing alcohol while C.H. was in her care. Billie refused to allow Clancy to conduct a home visit, but met Clancy at her office, where she had also brought C.H. Billie also shared some documents and signed releases. Clancy's findings were that, between November through the rest of the school year, C.H. had not attended school. He was unable to investigate the alcohol allegation because he was unable to do a home visit. Clancy's investigation was closed on July 1, 2022. There is no current open investigation regarding C.H.

¶ 58    In a July 7, 2022, letter to Bryan, Clancy stated that, in response to a May 18, 2022, referral to Children and Youth Services, a full safety assessment was not conducted due to Billie's lack of cooperation, specifically, her refusal to allow home visits or confirm her address. However, the agency confirmed that C.H. had not attended school since November 2021, and the agency was

concerned that he was not involved in adequate services. Lurie's discharge instructions stated that he was to participate in a partial hospitalization program, however, the only services he had received since discharge was seeing a psychiatrist in Maryland who provided medication management through virtual sessions. The investigation closed on July 1, 2022, due to minimal cooperation, and a new investigation would be opened "if sufficient concerns are raised."

¶ 59                                            4. Billie

¶ 60     During her case-in-chief, Billie testified that she made Washington, D.C., her permanent residence in July 2022. C.H. is enrolled at Hearst, and he has an IEP. During the prior school year, C.H. was enrolled at Rodolfo Lozano Bilingual Elementary School in Chicago, but did not attend school in person. Rather, he attended remotely, but not consistently. He was not stable enough to meet the criteria for a safety plan to attend in person. Billie attempted to enroll C.H. in Chicago Public Schools remotely (on a permanent basis), but administrative factors prevented that from occurring.

¶ 61     At Hearst, C.H. is enrolled in a cluster program with six other students. He began attending Hearst on August 29, 2022, and is doing well in school. C.H. is having a better experience at Hearst than he had in Chicago. He takes some courses with the general education population at school. A teacher informed Billie that, if C.H.'s anxiety could be effectively controlled, he could be transitioned out of the cluster program and into the general education program. C.H. attends after-school programs, such as pottery and chorus, and they are going well.

¶ 62     Billie lives in a two-bedroom apartment in Cleveland Park, which is a neighborhood with embassies and, thus, patrolled by the United State Secret Service. A park is within easy walking distance of the apartment, and it is more spacious than her apartment in Chicago and in a better neighborhood.

¶ 63    Addressing visitations since May 2022, Billie testified that she is present for some visitations. She explained that, if C.H. states that he is going to hang up during the visitation, then Billie tries to be present to keep him in the conversation and to keep him from getting to the point that he is violent. She has observed C.H. escalating during visitations with Bryan and has asked Bryan to stop escalating him. Bryan tells C.H. that his opinion is incorrect, for example, and C.H. restates his opinion, they go back and forth, and C.H. "will immediately fly off the handle, and he says profane [*sic*] things, he's physically violent." Billie administers an extra dose of Clonidine if C.H. escalates.

¶ 64    C.H. is currently taking Ritalin, Risperidone, Clonidine, and Trazodone. The medications have not changed since the trial. He is stable on his medication. C.H.'s doctor reassesses his need for medication every 30 days, as the medications are not refillable. Currently, C.H. receives psychiatric care from Dr. Florence Nguh and sees her monthly. Initially, after C.H. was released from the hospital, he saw Dr. Nguh every week. Beginning in April 2022, he started seeing her monthly.

¶ 65    Billie has hired a nanny to help with school drop-offs and pick-ups and to take C.H. to recreational activities on days he does not have afterschool activities.

¶ 66    Addressing Bryan's summer parenting time, Billie testified that, initially, Bryan was to have a week of parenting time in June 2022, but he failed to schedule it and did not give her details of plans to pick up C.H. Under the allocation judgment, Bryan was next to have parenting time in July 2022 (Billie was in Washington, D.C., by this time). Bryan, according to Billie, did not ask her to provide him with her address in Washington, D.C.; he was aware that she was residing there. At no time did she tell Bryan that he could pick up C.H. for his parenting time in Pennsylvania.

¶ 67    Pursuant to an agreed order, Bryan was next to pick up C.H. outside the zoo on the date that parenting time was scheduled. Billie informed C.H., who was concerned that Bryan would not bring him back, that Bryan was going to bring him back one week later. Bryan, however, did not affirmatively say that he would bring back C.H. in seven days. He said, "we'll see." He alluded to C.H. that he "would bring him back when he felt like it." These conversations occurred during Zoom parenting time and for which Billie was present.

¶ 68    C.H. was anxious at the zoo, because he had not seen Bryan in a long time. Billie reassured him and told him that she would see him again in one week. C.H. got into Bryan's car, and Sparks said something to him. C.H. immediately got out of the car and ran down the sidewalk and into the zoo entrance. Billie chased after him. She was able to get him back out. There were police officers present. In front of the officers, C.H. hit Bryan with a Lego bag that contained his medicine and toothbrush. Bryan bled, and C.H. ran away. "There was some confusion. It was, at most, ten seconds." Billie ran after C.H. The police separated Billie and C.H. from Bryan. In the end, the police told Billie to take C.H. and leave the zoo. Billie denied that she hugged C.H. after he hit Bryan; she testified that she held him, and he ducked out from under her and ran. After this incident, Bryan did not travel again to Washington, D.C., for parenting time.

¶ 69    Billie further testified that, on October 6, 2022, Bryan had a Zoom visitation with C.H. that caused her concern. Bryan told C.H. that he had obtained documents from his school and that he had spies everywhere and that he is always going to know what C.H. is doing. When C.H. asked how he knew information about him, Bryan replied that he had spies everywhere. C.H. expressed concerns about returning to school. This exacerbated C.H.'s anxiety and has impacted his trust in his teachers.

¶ 70    Billie testified that she has made an effort to have C.H. available for Bryan's scheduled Zoom visitations.  Bryan has cancelled Zoom visitations about once per week on average for a total of three times.

¶ 71    On cross-examination, Billie testified that Bryan invalidated C.H.'s feelings during visitations by telling him his opinion is incorrect and offering an opinion that he feels is an appropriate opinion for him.  Then, C.H. either becomes verbally defensive or has physical reactions such as slamming something down or leaving the room.  Also, C.H. asks Bryan why he is mean to him.  During visitations, C.H. has also told Bryan that he hates him.  Since May 2, 2022, C.H. has told Bryan that he is going to kill him.  Billie testified that it is appropriate for C.H. to be frustrated, and she verbally admonishes him when he uses words that are not safe.  Billie believes that Bryan bullies and emotionally and verbally abuses C.H. and exacerbates his anxiety.  She denied obstructing any visits between C.H. and Bryan.

¶ 72    Between November 2021 and May 2022, Billie testified as to C.H.'s schooling that she was following the recommendations of the Chicago Public Schools.

¶ 73    C.H. is currently repeating fourth grade.  His math proficiency is at a first grade level, as it was at his school in Chicago.  His reading proficiency is between first and second grade, the same as in Chicago.  He tries to play soccer during recess.  C.H. is about five feet two inches tall.  Billie testified that she does not know his weight.

¶ 74    Billie further testified that she did not read Bryan's e-mails (but some of her e-mails to him were addressed during the hearing).  She blocked Bryan's phone number on her phone earlier in 2022 because he harasses her.

¶ 75    Since May 2, 2022, C.H. has not done anything that has risen to the level of concern for which she would re-hospitalize him. However, she has noticed an escalation of his agitative behaviors. Bryan, according to Billie, is the only person who triggers C.H.

¶ 76    When asked where C.H. learned a term such as "fucking psychopath," Billie testified that she did not know, but acknowledged she likely used it in e-mails to Bryan. When asked where C.H. learned about alcohol, Billie responded that it was from Bryan, who spoke about it to C.H. during parenting time calls.

¶ 77    In response to a question about why she did not provide Bryan with her Washington, D.C., address in July 2022 when she received multiple notices that he was traveling to Pennsylvania to pick up C.H. for visitation, Billie testified that Bryan insisted she lived in Pennsylvania when she tried to tell him that she moved to Washington, D.C. Billie provided Bryan with her apartment number for the first time during the hearing and while on the witness stand.

¶ 78    On redirect examination, Billie testified that Bryan tells C.H. during visitations that it is morally reprehensible to consume alcohol and that Billie does so because she is an alcoholic. Bryan has also asked C.H. to observe Billie's use of alcohol and report back about it. Since she has moved into her current address, the police have been called by Bryan for a wellness check two or three times. C.H. asked Bryan why he called the police, and Bryan responded that he wanted to make sure that C.H. was being taken care of.

¶ 79                                    5.  Bryan

¶ 80    Bryan testified again in rebuttal. He denied that he agitates C.H. during Zoom visitations and claims that Billie does so. He also denied mentioning any visits by the police or discussing the police with C.H. All discussions concerning visitation have to be initiated by Bryan and are

met with obfuscation, resistance, and verbal abuse. At one point, a counterproposal was promised but never offered.

¶ 81                                    D. Trial Court's Order

¶ 82    On November 15, 2022, the trial court denied Bryan's motion to modify visitation, finding that, other than the continuing degradation of the parties' relationship, there was no substantial change in circumstances and that modification was not in C.H.'s best interests. The court noted that, after its May 2, 2022, order, it entered an amended allocation judgment on July 6, 2022. Addressing a substantial change in circumstances, the court noted that Bryan had alleged that Billie does not follow court orders, does not read e-mails, denies that Bryan is C.H.'s father, provided a false address, claimed to have sole decisionmaking authority, obstructed visitation, blocked information sharing, and threatening Bryan. Bryan asked that C.H. primarily reside with him. Billie, the court further noted, argued that there was no change, C.H. was thriving, doing well in school, and receiving therapy. The court found that the truth was "somewhere in the middle."

¶ 83    The court determined that the only substantial change in the circumstances was the continued deterioration of the parties' relationship. The court noted that Sparks had been qualified as an expert, however, it discounted her testimony and opinion because she did not conduct a formal evaluation of C.H. Since the May 2, 2022, order, Sparks, the court noted, had spent about 15 minutes observing C.H. (at the zoo). Given her brief interactions with C.H., the lack of any one-on-one interaction with him, and the fact that she had not reviewed any updated school records, the court gave her opinion little weight as an expert and found that it did not substantiate a substantial change in circumstances.

¶ 84    Next, addressing Clancy's July 7, 2022, letter, the court noted that Clancy's investigation ended with no action. The court also noted that the letter expressed concerns about C.H. not

attending school in July and the court found that there was no evidence that there was school that month. "I have evidence that the child has since started school at Hearst, which the GAL reviewed and approved." (The court did not address school attendance between December 2021 and June 2022.) As to C.H.'s mental health treatment, the court found that the evidence showed that he was seeing Dr. Nguh every month.

¶ 85    Addressing Billie, the court found incredible her testimony that she did not read e-mails. It noted that she sent Bryan an e-mail that was "absurd and idiotic," portions of which were directed to the court (and may have warranted finding her in contempt if she had made the statement in court). Billie also did not follow the specific dictates of the allocation judgment.

¶ 86    The court found that the evidence did not support a change of the allocation judgment. Further, it noted that the allocation judgment addressed where pickups and drop-offs were to occur (*i.e.*, at Billie's residence), access to educational and mental health records, and other matters. The court noted "I can't find that a wholesale modification is necessary because the parties haven't followed the current dictates of the allocation judgment." Finally, the court noted the timing of the motions, and "how recently the Court decided the relocation[.]" The allocation judgment addressed the parties' concerns, and orders were expected to be followed. "When they are not followed, I expect I'll see motions to enforce or compel compliance, and I'll deal with those as necessary."

¶ 87    The trial court also noted that Bryan had filed his motions before the final allocation judgment had been filed on July 6, 2022. The court noted that Bryan provided no evidence of alienation. He also did not provide the alleged e-mails Billie sent to the school district or to mental health providers that prevented Bryan from accessing C.H.'s records.

¶ 88    The court admonished Bryan that his parenting time was to take place at Billie's residence, not her sister's residence or elsewhere.   Finally, the court denied Bryan's motion for a psychological evaluation of Billie.   Bryan appeals.

¶ 89                                    II. ANALYSIS

¶ 90                                A. Preliminary Matters

¶ 91    Initially, we note that we have issued our decision outside the 150-day timeframe specified in Illinois Supreme Court Rule 311(a)(5) (eff. July 1, 2018), which states, "[e]xcept for good cause shown, the appellate court shall issue its decision within 150 days after the filing of the notice of appeal."   Bryan filed his notice of appeal on November 21, 2022, and our disposition was due on April 20, 2023.   See Ill. S. Ct. R. 311(a)(4), (5) (eff. July 1, 2018).

¶ 92    Bryan's appellant's brief was due on January 17, 2023, and this court sent him a warning that it was overdue.   Bryan subsequently moved four times for an extension of time to file his brief. In the first three instances, he raised issues concerning his request for hearing transcripts and waivers of related fees.   His final request was ultimately rendered moot because, on March 30, 2023, he moved for leave to file his brief *instanter*.   We granted the motion, and set a new briefing schedule for the remaining briefs: Billie's appellee's brief was due on April 20, 2023, and Bryan's reply was due on April 27, 2023.   Subsequently, Billie, *pro se*, sought an extension of time to file her brief or for a stay.   We denied her request for a stay on May 4, 2023, but granted her request for an extension of time, with her brief due on May 12, 2023, and Bryan's reply brief due on May 19, 2023.   Billie did not file a brief on either its due date or within seven days of an overdue notice we issued on May 22, 2023.   Also, on May 1, 2023, Bryan moved to supplement the record with certain transcripts.   We denied his motion, without prejudice, on May 4, 2023.

¶ 93    In light of the foregoing, we find we have good cause to excuse our failure to issue our decision within the timeframe set forth in Rule 311(a)(5).  See *In re B'Yata I.*, 2013 IL App (2d) 130558, ¶ 26.

¶ 94    We also note that, because Billie has not filed an appellee brief, our review is guided by the principles set forth in *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128 (1976).  Under *Talandis*, when the appellee does not file a brief, the appellant is not entitled to a *pro forma* reversal, because "[a] considered judgment of the [circuit] court should not be set aside without some consideration of the merits of the appeal."  *Id.* at 131.  Rather, we have three distinct, discretionary options: we may (1) serve as an advocate for the appellee and decide the case if we determine justice so requires, (2) decide the merits of the case if the record is simple and the issues can be easily decided, or (3) reverse the trial court when the appellant's brief demonstrates *prima facie* reversible error that is supported by the record.  *Id.* at 133.

¶ 95    We conclude that the record here, as in Bryan's first appeal, is simple, and the issues presented can be decided without the aid of an appellee's brief.  Accordingly, we choose to address the merits of Bryan's appeal.

¶ 96                    B. Motion to Modify Visitation

¶ 97    Turning to the merits, Bryan argues first that he established a substantial change in circumstances and that it is in C.H.'s best interests that he be granted custody.  Bryan asserts that he showed that Billie blocks all in-person visitation and relocated twice (to Pennsylvania and then to Washington, D.C.) without notifying him of her new address.  He notes that the Pennsylvania trip involved intimidation by one of Billie's relatives, and the zoo trip involved C.H. inflicting a head wound with substantial bleeding.  Bryan also contends that Billie has interfered with Zoom visitation, including arguing with him and C.H. and leaving her camera deactivated.  He also

asserts that Billie does not consult with him beforehand, or advises him after the fact, regarding decisions affecting C.H.'s physical, mental, emotional, medical, psychiatric, spiritual, or educational needs. Bryan also asserts that some of C.H.'s medications are not suitable for him and were acquired by Billie without Bryan's knowledge or consent. Bryan contends that he should be awarded custody of C.H. so that he can obtain counseling for his son, "not a cornucopia of drugs that have serious side effects affecting [C.H.'s] physical health."

¶ 98 Parenting time may be modified upon a showing that a substantial change has occurred in the circumstances of the child or of either parent and modification is necessary to serve the child's best interests. 750 ILCS 5/610.5(c) (West 2020). Upon such a showing, the court must allocate parenting time according to the child's best interests. 750 ILCS 5/602.7(a) (West 2020).

¶ 99 In allocating parenting time, the court shall consider all relevant factors, including (1) each parent's wishes; (2) the child's wishes; (3) the amount of time that each parent spent performing caretaking functions with respect to the child in the 24 months preceding the filing of any petition for allocation of parental responsibilities; (4) any prior agreement or course of conduct between the parents relating to caretaking functions; (5) the interaction and interrelationship of the child with his or her parents and siblings and with any other person who may significantly affect the child's best interests; (6) the child's adjustment to his or her home, school, and community; (7) the mental and physical health of all individuals involved; (8) the child's needs; (9) the distance between the parents' residences, the cost and difficulty of transporting the child, the parents' and child's daily schedules, and the ability of the parents to cooperate in the arrangement; (10) whether a restriction on parenting time is appropriate; (11) the physical violence or threat of physical violence by the child's parent directed against the child or other member of the child's household; (12) each parent's willingness and ability to place the child's needs ahead of his or her own; (13)

each parent's willingness and ability to facilitate and encourage a close and continuing relationship between the other parent and the child; (14) the occurrence of abuse against the child or other member of the child's household; (15) whether one parent is a sex offender or resides with a sex offender; (16) the terms of the parent's military family-care plan if a parent is a member of the United States Armed Forces who is being deployed; and (17) any other factor that the court expressly finds to be relevant.  750 ILCS 5/602.7(b) (West 2020).

¶ 100   The trial court is in the best position to assess witness credibility and to determine the child's best interests, so we afford its allocation of parenting time great deference. *In re Marriage of Lonvick*, 2013 IL App (2d) 120865, ¶ 33.  We will not disturb a trial court's determination concerning the allocation of parenting time unless it is against the manifest weight of the evidence. *In re Marriage of Bates*, 212 Ill. 2d 489, 515 (2004).  A determination is against the manifest weight of the evidence only when the findings appear to be unreasonable. *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 70.

¶ 101   Bryan's primary complaints are that Billie interferes with the Zoom visitations, makes unilateral decisions concerning C.H.'s care, and obstructed two attempts at visitations (Pennsylvania and the zoo).  The trial court found that, other than the further degradation of the parties' relationship, there was no substantial change in circumstances.  We cannot conclude that the court's decision was unreasonable.  The court specifically noted Bryan's assertions that Billie does not follow court orders, read e-mails, denies that he is the father, claims to have sole decisionmaking authority, obstructs visitation, and blocked information sharing.  However, the court also acknowledged and considered Billie's assertions, including that there was no change, and that C.H. was thriving, doing well in school, and receiving therapy.

¶ 102 Based on the evidence, the court reasonably found that, other than that the parties' relationship had continued to deteriorate, the truth was "somewhere in the middle." It found incredible Billie's testimony that she did not read Bryan's e-mails and determined that she did not follow the specific dictates of the allocation judgment. As to Bryan, the court found that he provided no evidence of alienation and did not provide alleged e-mails Billie sent to C.H.'s school or mental health providers that prevented Bryan from accessing C.H.'s records. It also admonished Bryan that his parenting time was to take place at Billie's residence, not elsewhere, a reference to his trip to Pennsylvania. The court noted that the allocation judgment addressed the location of pick-ups and drop-offs and access to educational and other records. The parties, it determined, had not followed the dictates of the judgment, and it noted that Bryan's motions had been filed very soon after the May 2022 judgment and before the July 2022 final allocation judgment had even been filed. These findings were not against the manifest weight of the evidence. The court heard evidence from Bryan and Sparks that Billie emotionally abuses C.H. and evidence from Billie that Bryan escalates C.H. during Zoom visitations, is the only person who triggers C.H., and asks him to monitor Billie's alcohol use. It resolved the conflicts and assessed credibility in Billie's favor, and we cannot conclude that its resolution was unreasonable. Billie's testimony was not inherently incredible.

¶ 103 The court's findings concerning Sparks and Clancy were also not erroneous. The court discounted Sparks' testimony, noting that she did not, as she acknowledged, formally evaluate C.H., had spent only 15 minutes in person with C.H. since May 2022 (at the zoo), and had not reviewed any updated school records. As to Clancy, the court noted that his investigation ended with no action, and his concerns about C.H. attending school were contradicted by evidence that C.H. was attending Hearst, a school the GAL had researched and approved. We also note that

Clancy testified that there were no current open investigations regarding C.H. Further, although not noted by the court, Billie testified that C.H. attended Chicago Public Schools during the 2021-22 school year, but not consistently. He was not stable enough to meet the criteria for a safety plan to attend in person, and she attempted to enroll C.H. in Chicago Public Schools remotely (on a permanent basis), but administrative factors prevented that from occurring.

¶ 104 Bryan seeks to essentially blame Billie for C.H.'s striking him with the bag at the zoo because she allegedly hugged him immediately afterwards. Billie denied this, stating that she held C.H., and testified that C.H. had been anxious about seeing his father because he had not seen him in person in a long time. It was not unreasonable for the court to credit Billie's explanation, as it was not inherently incredible. As to C.H.'s use of profanities and other aggressive or threatening language, Billie acknowledged that she likely used some similar language in e-mails to Bryan but that she admonishes C.H. when he uses words that are not safe.

¶ 105 The parties' relationship continues to be combative, and they blame each other for C.H.'s outbursts during the visitations. The trial court twice found that their co-parenting relationship continued to deteriorate. However, we cannot conclude that the trial court's finding that there was no substantial change in circumstances and that it was not in C.H.'s best interests to modify visitation was against the manifest weight of the evidence.

¶ 106 Finally, we note that Bryan also raises issues previously addressed in his first appeal, including some of Billie's actions prior to the May 2022 order (such as removing C.H. from this jurisdiction between November 2021 and May 2022) and the court's denial of admission of certain video exhibits. We will not revisit them.

¶ 107 In summary, the trial court did not err in denying Bryan's motion to modify visitation.

¶ 108                    C. Motion for Psychological Evaluation

¶ 109    Next, Bryan argues that the trial court erred in denying his motion for a psychological evaluation of Billie. He contends that Billie's "irrational outbursts" in court, her refusal to provide her apartment number, and her consistently evasive answers in court established that an evaluation was warranted. For the following reasons, we find no error.

¶ 110    During the hearing, the court declined to consider testimony specifically/separately offered by Bryan concerning his motion for a psychological evaluation (specifically, Clancy's testimony and Sparks' affidavit), noting that the decision was within its discretion "after making observations before or during trial."

¶ 111    Here, Bryan references an alleged outburst by Billie at Lurie leading up to his first appeal. He also references her testimony in December 2021, which was also relevant to his first appeal. Bryan also contends that Billie's evasive answers, her refusal to provide her complete address until compelled by the court, her removal of C.H. across state lines without notice, the blocking of Bryan's phone number, and her "venomous" responses to his e-mails demonstrate a contempt for the coparenting concept. He also again contends that her obstruction and evasion of in-person visitation and her interference with Zoom visitation evidences her contempt for the court's authority. Finally, he points to Billie's alleged emotional abuse of C.H., asserting that it supports finding compelling circumstances warranting an evaluation.

¶ 112    Rule 215(a) provides, in relevant part:

> "In any action in which the physical or mental condition of a party or of a person in the party's custody or legal control is in controversy, the court, upon notice and on motion made within a reasonable time before the trial, may order such party to submit to a physical or mental examination by a licensed professional in a discipline related to the physical or mental condition which is involved." Ill. S. Ct. R. 215(a) (eff. Jan. 1, 2018).

¶ 113   Subsection (d)(2), which addresses examination during trial, provides, "Should the court at any time during the trial find that compelling considerations make it advisable to have an examination and report at that time, the court may in its discretion so order." Ill. S. Ct. R. 215(d)(2) (eff. Jan. 1, 2018).

¶ 114   A trial court has the power to order a psychological examination of a party where that condition is an issue in the case. *In re Marriage of Scott*, 75 Ill.App.3d 710, 713 (1979).  While a court should not hesitate to order examinations under the rule when needed, it should not do so lightly, and should balance the interests of both parties in determining what justice requires. *Jarke v. Mondry*, 2011 IL App (4th) 110150, ¶ 30.  We review the denial of such a motion for abuse of discretion. *Kaull v. Kaull*, 2014 IL App (2d) 130175, ¶ 82, as modified on denial of reh'g (Jan. 27, 2015).  "Discovery should be denied when insufficient evidence suggests that the requested exam is relevant or will lead to relevant evidence." *Id.* ¶ 73.  A court abuses its discretion where no reasonable person would adopt the court's view. *Kramer v. Ruiz*, 2021 IL App (5th) 200026, ¶ 20.

¶ 115   We conclude that the trial court did not abuse its discretion in denying Bryan's motion for a psychological evaluation of Billie.  In his motion, Bryan alleged that Billie's behavior was negatively affecting C.H.'s emotional health and behavior.  He relied on Sparks' testimony concerning Billie's behavior and Sparks' opinion that Billie possibly had a Cluster B personality disorder.  However, the court discounted Sparks' testimony, noting that she did not conduct a clinical assessment of Billie (or C.H.), a fact that she acknowledged on cross-examination.  Bryan also argued that Billie's e-mails reflected her hostile and obstructive conduct, as did her refusal to provide her apartment number, but he did not tie this behavior to his conclusory and speculative

allegations concerning her psychological health, and it was reasonable for the court to have discounted these allegations in assessing the need for an evaluation.

¶ 116  In summary, the trial court did not err in denying Bryan's motion for a psychological evaluation of Billie.

¶ 117                                III. CONCLUSION

¶ 118  For the reasons stated, we affirm the judgment of the circuit court of McHenry County.

¶ 119  Affirmed.